**Joseph BALSAVAGE, Plaintiff,**

**v.**

**RYDER TRUCK RENTAL, INC., and Automotive Mechanics Local Union No. 477, International Association of Machinist and Aerospace Workers, AFL–CIO, Defendants.**

**Civ. No. 88–1709 (CSF).**

United States District Court,
D. New Jersey.

May 11, 1989.

---

John A. Sweeney, Sweeney & Sweeney, Mount Holly, N.J., for Joseph Balsavage.

Karen Honeycutt, Roseland, N.J., and Patricia McConnell, Vladek, Waldman, Elias & Engelhard, P.C., New York City, for Automotive Mechanics Local Union No. 477, Intern. Ass'n of Machinist and Aerospace Workers, AFL–CIO.

Robert H. Simandl, Livingston, N.J., for Ryder Truck Rental, Inc.

## OPINION

CLARKSON S. FISHER, District Judge.

Before the court is the motion of defendant, Automotive Mechanics Local Union No. 447, International Association of Machinists and Aerospace Workers, AFL–CIO, ("AMLU"), for summary judgment.[1] The court has considered the parties' submissions. For the reasons discussed below, AMLU's motion is denied.

The parties agree on the events which began this lawsuit. Plaintiff, Joseph Balsavage, was a mechanic with co-defendant, Ryder Truck Rental, Inc. ("Ryder"), from October 5, 1976, to January 7, 1986. During the relevant times Balsavage was a member of AMLU, and the terms of his employment were governed by the collective bargaining agreement between that organization and Ryder. On January 7, 1986, Ryder terminated Balsavage's employment.

The parties disagree on certain events between Balsavage's January, 1986, discharge and the filing of his complaint. Balsavage contends that on January 23, 1986, a meeting was held between Ryder representatives and AMLU delegates to discuss his discharge. Plaintiff claims that shortly after the meeting, AMLU representative

John Scarfi promised Balsavage that AMLU would arbitrate his grievance against Ryder. AMLU has presented testimony to the effect that no such meeting took place; Scarfi himself has stated that he had absolutely no contact with Balsavage regarding his discharge.

. Balsavage's subsequent attempts to contact AMLU about Scarfi's promise were met with silence. Between April 2 and April 8, 1986, Balsavage acquired a grievance form from AMLU. He completed the form and returned it to the union by registered mail. By June of 1986, Balsavage concluded that AMLU was not going to fulfill its agent's promise. Over one year later, on November 18, 1987, Balsavage filed suit in the Superior Court of New Jersey, Law Division, Burlington County, against both defendants. His case was removed to this court in April of 1988.

AMLU's motion poses the sole issue of whether this suit is barred by the statute of limitations. Before addressing this question, however, a brief discussion of the legal background is appropriate. A person's ability to labor is his property; he may exercise his own rights in fixing the terms and conditions under which this ability is to be exercised. *See* U.S. Const. Art. I, sec. 10; *Adair v. United States,* 208 U.S. 161, 172, 179, 28 S.Ct. 277, 279, 282, 52 L.Ed. 436 (1908), *overruled on other grounds, Phelps Dodge Corp. v. N.L.R.B.,* 313 U.S. 177, 187, 61 S.Ct. 845, 849, 85 L.Ed. 1271 (1941); *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 607, 4 L.Ed. 629 (1819). Under our national scheme of labor legislation, however, a union may acquire and exercise these individual rights by operation of the law.

■ Once a union attains representative status, the law makes it the sole agency through which negotiations for a person's work are made, and by which his rights are protected. *See Bowen v. United States Postal Serv.,* 459 U.S. 212, 225 & n. 14, 103 S.Ct. 588, 596 & n. 14, 74 L.Ed.2d 402 (1983); *DelCostello v. International Bhd.*

---

**1.** Defendant Ryder Truck Rental, Inc., has not joined in the motion.

*of Teamsters,* 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n. 14, 76 L.Ed.2d 476 (1982) (both cases outlining collective bargaining power of union management). In this regard, the union may maintain a "closed shop," wherein no one may work unless he joins the organization. *Wallace Corp. v. N.L.R.B.,* 323 U.S. 248, 250–51, 65 S.Ct. 238, 239, 89 L.Ed. 216 (1944); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 504, 60 S.Ct. 982, 998, 84 L.Ed. 1311 (1940). Congress enacted this legislation to serve the "national interest in industrial peace." *Phelps Dodge,* 313 U.S. at 183, 61 S.Ct. at 847.

■ The union may also possess individual rights to enforce employment contracts. No employee may sue his employer for breach of his employment contract in the first instance; he may sue in his own right only after complying with the grievance procedures agreed upon by the union and his employer. *Clayton v. U.A.W.,* 451 U.S. 679, 696, 101 S.Ct. 2088, 2099, 68 L.Ed. 2d 538 (1981); *Nanney v. Chrysler Corp.,* 600 F.Supp. 1248, 1251–53 (D.Del.1984). As the Supreme Court has said, " 'The grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government.' " *United Parcel Serv., Inc. v. Mitchell,* 451 U.S. 56, 63, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1982) (*quoting United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960)). This exhaustion requirement is "not a mere ritual or formality. It is a necessary complement to the union's status as exclusive bargaining representative, enabling it to actively participate in the continuing administration of the contract." *Abrams v. Carrier Corp.,* 434 F.2d 1234, 1246 (2d Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971) (*citing Republic Steel v. Maddox,* 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965)). The union's active participation is required not only by its own status as a collective contractee, but also by the national policy of deterring " 'disruptive influ-ence[s] upon both the negotiation and administration of collective agreements,' " *Republic Steel,* 379 U.S. at 653, 85 S.Ct. at 617 (*quoting Teamsters Local v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962)), by providing for a quick end to employee-employer disputes. *United Parcel Serv. v. Mitchell,* 451 U.S. 56, 63, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981); *Abrams,* 434 F.2d at 1246.

■ Moreover, a union's possession of rights is not restricted to its agreement with an employer. Unions possess considerable power over the individual worker. Union membership is not a right, but a privilege. *Moynahan v. Pari–Mutuel Employees Guild, Local 280,* 317 F.2d 209, 210 (9th Cir.1963), *cert. denied,* 375 U.S. 911, 84 S.Ct. 207, 11 L.Ed.2d 150 (1963); *Hughes v. Local 11, International Ass'n. of Bridge Workers,* 287 F.2d 810, 814 (3d Cir.1960), *cert. denied,* 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961). Consequently, a union may exclude a qualified applicant from membership even though he will be rendered unable to pursue his vocation. *Courant v. International Photographers Local 659,* 176 F.2d 1000, 1001–03 (9th Cir. 1949), *cert. denied,* 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950).

■ The union also posseses disciplinary authority over its members. Subject to traditional notions of procedural due process afforded a member by statute, *Falcone v. Dantinne,* 420 F.2d 1157, 1165 (3d Cir.1969), unions may try a member for offenses which only the union may define, and which need not be forbidden by written rules.[2] *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 244–45, 91 S.Ct. 609, 616, 28 L.Ed.2d 10 (1971). The penalties inflicted may include exclusion from union membership. *See Id.* (union member expelled for striking union superior). In this, as in other matters, union management has great authority; as indicated above, the loss of union membership more often than not means the loss of an

---

2. The union's failure to adhere to its own internal procedures, without a violation of some rule imposed by outside law, is irrelevant. *Wellman*

*v. International Union of Operating Engineers,* 812 F.2d 1204, 1206 (9th Cir.1987).

individual's livelihood. *Falcone v. Dantinne*, 420 F.2d 1157, 1163 (3d Cir.1969). *See also Sanders v. International Ass'n. of Bridge Workers*, 235 F.2d 271, 272 (6th Cir.1956) (upholding expulsion from the union for life).

■ These characteristics notwithstanding, it must be remembered that unions are not arms of the state. They are simply voluntary, contractual associations of individual workers. *See N.L.R.B. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 182–84, 87 S.Ct. 2001, 2007–08, 18 L.Ed.2d 1123 (1967) (stating that relationship of union to its members is one of private contract); *Courant*, 176 F.2d at 1003 (holding that neither the fifth nor fourteenth amendments apply to union activity). The Supreme Court has, however, recognized that responsibilities accompany the great amount of private power possessed by labor organizations.

In *Steele v. Louisville & Nashville Ry. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed.2d 173 (1944) and *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944), the Court addressed the power of union management to forfeit the rights of nonmember black workers in negotiating a collective bargaining agreement. *Id.* 323 U.S. at 194–96, 65 S.Ct. at 228–29. The Court upheld the union's right to withhold membership on the basis of race, *id.*, but observed that the union's special role in labor relations required that the organization protect the interests of all workers:

So long as a labor union assumes to act as the statutory representative of a craft, it cannot rightly refuse to perform the duty, which is inseparable from the power of representation conferred upon it, to represent the entire membership of a craft. While the statute does not deny to such a bargaining labor organization the right to determine eligibility to its membership, it does require the union, in collective bargaining and in making contracts with the carrier, to represent nonunion or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith.

*Id.* at 204, 65 S.Ct. at 233. The Court concluded that the union was required to permit black workers to comment on the union's proposed changes to the terms and conditions of their employment. *Id.*

*Steele* was decided under the Railway Labor Act, 45 U.S.C. sections 151, *et seq. Steele*, 323 U.S. at 204, 65 S.Ct. at 232. The application of the *Steele* rule was initially limited to plaintiffs alleging racial discrimination. Some courts also applied the duty to the negotiation of collective bargaining agreements. *See Thompson v. Brotherhood of Sleeping Car Porters*, 316 F.2d 191, 197–98 & nn. 10, 13 (4th Cir.1963) (summarizing cases). As time passed the courts extended *Steele* to non-racist union misbehavior. *Compare Nobile v. Woodward*, 200 F.Supp. 785, 786 & nn. 2–3 (E.D. Pa.1962) (allowing claim based on alleged malicious expulsion of individual on pretext of failing to pay dues, and summarizing cases) *and Gainey v. Brotherhood of Ry. Clerks*, 177 F.Supp. 421, 430–31 (E.D.Pa. 1959), *aff'd.*, 275 F.2d 342 (3d Cir.1960), *cert. denied*, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960) (dismissing claim based on geographic discrimination).

In *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Supreme Court expressly recognized the duty's application to all labor unions under the National Labor Relations Act. *Id.* at 337–39, 73 S.Ct. at 685–86. Moreover, in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Court extended the duty to the union's representation of workers in grievance proceedings under a collective bargaining agreement. *Id.* at 47, 78 S.Ct. at 102. The maturation of the *Steele* rule left unions under a duty to represent all workers in a bargaining unit "without hostile discrimination, fairly, impartially, and in good faith." *Steele*, 323 U.S. at 204, 65 S.Ct. at 233.

In its most modern formulation, the duty of fair representation:

exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individu-

als in the unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'

*DelCostello*, 462 U.S. at 164 n. 14, 103 S.Ct. at 2290 n. 14 (*quoting in part Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967)). *Accord Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir.1970). The doctrine recognizes that the bargaining representative "is responsible to, and owes complete loyalty to, the interests of all whom it represents." *Huffman*, 345 U.S. at 338, 73 S.Ct. at 686.

It is important to note that the duty of fair representation has never been considered a matter of contract, whether between a union and its members or a union and an employer. The Court has consistently emphasized that the concept "is derived from the duty imposed by the statute on the bargaining representative" in order to protect a "federal right implied from the statute and the policy which it has adopted." *Steele*, 323 U.S. at 204, 65 S.Ct. at 232. *Accord International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 46 n. 8, 99 S.Ct. 2121, 2125 n. 8, 60 L.Ed.2d 698 (1979); *Vaca*, 386 U.S. at 177, 87 S.Ct. at 909. Suits under the rule deal with "judicially created remedies for a judicially implied cause of action." *Foust*, 442 U.S. at 47 n. 9, 99 S.Ct. at 2125 n. 9. (applying Railway Labor Act). Further, like any imposed duty, the *Steele* rule is subject to the needs of public policy and the changing conditions of a turbulent society. *See Huffman*, 345 U.S. at 338–43, 73 S.Ct. at 686–88 (holding that union did not violate duty by agreeing to seniority credits for military service which discriminated as to employees who did not so serve or had served prior to their employment).

Although unions are under a fiduciary duty to represent aggrieved workers in "'complete good faith and honesty of purpose,'" *Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1018 (3d Cir. 1977), *cert. denied*, 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977) (*quoting Hines v. Anchor Motor Freight*, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976)), this duty must be not interpreted according to the common law of fiduciary relationships. As the Supreme Court has noted, under the common law:

'Many forms of conduct permissible in the workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.... Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of [the fiduciary's] behavior.'

*Seminole Nation v. United States*, 316 U.S. 286, 297 n. 12, 62 S.Ct. 1049, 1055 n. 12, 86 L.Ed. 1480, 1777 (1942) (*quoting Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928)). A union may handle worker rights with negligence and not violate its fiduciary duty. *See Findley v. Jones Motor Frieght*, 639 F.2d 953, 960 (3d Cir.1981) (stating that union failure to call known witnesses at grievance hearing or ascertain identity of other witnesses not actionable); *Coe v. Rubber Workers*, 571 F.2d 1349, 1350 (5th Cir.1978) (holding that union did not breach duty where it misdesignated notice, thereby barring arbitration). Rather, the organization's duty is the lesser obligation to avoid gross negligence, malice or bad faith. *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916; *Florey v. Air Line Pilots' Ass'n.*, 575 F.2d 673, 676 (8th Cir. 1978) (holding that "[i]mproper union motivation is the very crux of the fair representation doctrine and is an essential element in all fair representation cases").

The duty of fair representation may be enforced by a "hybrid" suit, in which a worker proceeds against both his union and employer. As the term implies, a "hybrid" has a dual nature. The worker's claim against his employer is for breach of the collective bargaining agreement. His claim against the union is for its breach of the implied duty of fair representation. *Del-*

*Costello,* 462 U.S. at 164, 103 S.Ct. at 2290; *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 671 n. 1 (9th Cir.1988); *Proudfoot v. Seafarer's Int'l. Union,* 779 F.2d 1558, 1559 (11th Cir.1986). These causes of action are symbiotic; a hybrid plaintiff must "prove both that the employer violated its contract and that the union breached its duty, since the two claims are inextricably linked." *Demars v. General Dynamics Corp.,* 779 F.2d 95, 97 (1st Cir.1985); *and see DelCostello,* 462 U.S. at 165, 103 S.Ct. at 2291; *Mitchell,* 451 U.S. at 62, 101 S.Ct. at 1563; *Vaca,* 386 U.S. at 186, 87 S.Ct. at 914; *Hines v. Anchor Motor Freight,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976).

At this point it is worth returning to the exhaustion requirement. As noted above, a worker must ordinarily resolve disputes with his union through internal proceedings, and settle arguments with his employer through the private resolution afforded by union agency. *Republic Steel,* 379 U.S. at 652–53, 85 S.Ct. at 616; *King v. New York Telephone Co. Inc.,* 785 F.2d 31, 33 (2nd Cir.1986); *Nanney,* 600 F.Supp. at 1251–53. Prior to the Supreme Court's *Clayton* decision, there was a difference of opinion as to whether and when an employee was required to exhaust all internal procedures for resolving his grievances against the employer or his complaints against the union. *Clayton,* 451 U.S. at 683–85 & nn. 5–8, 101 S.Ct. at 2092–95 & nn. 5–8 (summarizing different rules). In *Clayton,* the Court held that neither kind of exhaustion was required "where an aggrieved employee cannot obtain either the substantive relief he seeks or reactivation of his grievance," *id.* at 693, 101 S.Ct. at 2097, and where there is no "reasonable possibility that the employee's claim will be privately resolved." *Id.* at 696, 101 S.Ct. at 2099.

*Clayton* excused resort to either internal or private proceedings to settle grievances against a union and an employer, thereby freeing a worker to maintain an immediate hybrid suit whenever his grievance has been poorly handled. Of course, the employer's alleged breach of the collective bargaining agreement will occur first; only that breach can bring about a grievance proceeding in the first place. The union's alleged breach will naturally occur later, during attempts to resolve the worker-employer dispute. Both these entities' violations of a worker's rights must be proved to succeed in a hybrid suit.

■ Finally, almost any act which would allow recovery for breach of the duty of fair representation would also support a finding of futility. At the same time, not all acts that would permit a finding of futility would allow recovery for breach of the duty of fair representation. *See e.g., Coe,* 571 F.2d at 1350 (holding that union not liable for misdesignating notice, thereby barring arbitration). Therefore, a hybrid plaintiff may generally bring his suit only if he can win it; in response, courts have equated futility with the union's breach of its duty of fair representation. *See, e.g., Vaca,* 386 U.S. at 186, 87 S.Ct. at 914 [3]; *Proudfoot,* 779 F.2d at 1559 (holding that hybrid suit accrues upon breach of duty of fair representation); *Adkins v. International Union of Elec., Radio & Machine Workers,* 769 F.2d 330, 336 (6th Cir. 1985) (stating that "the typical hybrid claim is based on the union's failure to properly process a grievance, so nonjudicial enforcement has already failed"); *Boone v. Armstrong Cork Co.,* 384 F.2d 285, 288, 291–92 (5th Cir.1967) (holding that exhaustion is not required in face of breach of fair representation duty).

■ To bring all this closer to the matter at hand, it may be said that any inquiry into the timeliness of a hybrid suit will almost always focus on the plaintiff's dealings with his union, as opposed to intercourse with his employer. A hybrid suit is subject to the time limit announced in *DelCostello,* which applied the six-month period in section 10(b) of the National Labor

**3.** The *Vaca* Court held that a "wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual reme-dies, provided the employee can prove that the union as a bargaining agent breached its duty of fair representation in its handling of the employee's greivance." *Id.*

Relations Act to hybrid suits.[4] *DelCostello,* 462 U.S. at 171, 103 S.Ct. at 2294. The general rule concerning limitary periods is that they begin when plaintiff may first maintain a cause of action against a defendant. *Dougherty v. United States Navy Bd. for Correction of Naval Records,* 784 F.2d 499, 502 (3d Cir.1986); *Kucera v. Metropolitan Life Ins. Co.,* 719 F.2d 678, 681 (3d Cir.1983). Moreover, it is well settled that a union need neither inform the employee of his grievance's progress nor notify him that the organization's own effort toward a private resolution of his dispute has ended. *Demars,* 779 F.2d at 98; *Bazarte,* 429 F.2d at 872. Finally, a union is not under a duty to draft an articulate and clear collective bargaining agreement; the document may well be incomprehensibly vague as to the date on which grievance proceedings must end.

The simultaneous nature of a hybrid suit, the virtual identity of the union's breach of its own duty with the necessary element of futility, and the general rules concerning limitary periods and union notice procedures may be combined into a potent obstacle to private redress of union and employer violations. The very acts of which an employee may complain, namely, employer and union callousness toward his rights, may allow the sufficient passage of time to bar any action he has against either of them. This would produce a cruel paradox: a union and an employer may be liable if they violate a worker's rights and yet escape liability as long as their transgression is done in a sufficiently effective manner.

In order to avoid this result, courts employ the "discovery" exception to pinpoint the beginning of *DelCostello's* six-month limit. *See Galindo v. Stoody Co.,* 793 F.2d 1502, 1509 (9th Cir.1986); *King,* 785 F.2d at 34 (explaining origin of the rule). The exception is a "judicially created device" which was "often applied to toll the run-

ning of a statute of limitations when the injury or its cause [was] not immediately evident to a victim." *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 553 (3d Cir.1985). Generally, the doctrine begins the calculation of a time limit at the point when a plaintiff knew or, through reasonable diligence should have known, that he possessed a cause of action. *United States v. Kubrick,* 444 U.S. 111, 123–24, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979); *Ciccarelli,* 757 F.2d at 553; *Kucera,* 719 F.2d at 681; *Kronfeld v. First Jersey Nat'l. Bank,* 638 F.Supp. 1454, 1474 (D.N.J.1986).

The cases diverge in their pronouncement of the exception as applied to hybrid suits. One formula is that the *DelCostello* statute begins to run when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the acts forming the alleged violation. *Hersh v. Allen Prods. Co., Inc.,* 789 F.2d 230, 232 (3d Cir.1986). *Accord Metz v. Tootsie Roll Indus., Inc.,* 715 F.2d 299, 304 (7th Cir. 1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984); *Chrysler Workers Ass'n. v. Chrysler Corp.,* 834 F.2d 573, 578 (6th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988); *Shapiro v. Cook United, Inc.,* 762 F.2d 49, 51 (6th Cir.1985). A second formula is given in *Scott v. International Bhd. of Teamsters, Local 863,* 725 F.2d 226 (3d Cir.1984), which held that the *DelCostello* statute begins to run when the "futility" of relying on union assistance "becomes apparent or should have become apparent" to the plaintiff. *Scott,* 725 F.2d at 229. *Cf., Grasty v. Amalgamated Clothing & Textile Workers,* 828 F.2d 123, 133 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988); *Lewis v. International Bhd. of Teamsters,* 826 F.2d 1310, 1317–18 (3d Cir.1987) (both cases applying same rule to *DelCostello* limita-

---

**4.** In *U.A.W. v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), the Supreme Court declined to require a uniform statute of limitation, noting that Congress had refused to provide a statute of limitations when it enacted section 301 of the Labor Management

Relations Act. *Id.* at 703–04, 86 S.Ct. at 1111–12. The Court concluded by stating that the need for uniformity did not require "the drastic sort of judicial legislation" involved in imposing a national time limit. *Id.* at 703, 86 S.Ct. at 1111–12.

tion of claim for violation of union constitution).

All the cases, however, make it clear that in practice the "appearance rule" is no different from the "discovery" rule; both formulae are concerned with plaintiff's knowledge of the facts allegedly entitling him to relief.[5] *Grasty*, 828 F.2d at 133–34 (remanding for further proceedings on whether communications with union prevented plaintiffs from seeing the "appearance" of futility); *Lewis*, 826 F.2d 1310, 1317–18 (remanding for further proceedings as to whether signals from the union would have given appearance of futility); *Scott*, 725 F.2d at 229 (discussing adequacy of union notice to plaintiffs); *Bey v. Williams*, 590 F.Supp. 1150, 1153 (W.D.Pa.1984), *aff'd.*, 782 F.2d 1026 (3d Cir.1986) (discussing ability of union action to communicate futility in context of hybrid claim). This approach is well settled in recent case law. *See, e.g.*, *Galindo*, 793 F.2d at 1509; *Hersh v. Allen Prods. Co., Inc.*, 789 F.2d 230, 233 (3d Cir.1986); *Dowty v. Pioneer Rural Elec. Coop., Inc.*, 770 F.2d 52, 56 (6th Cir.1985), *cert. denied*, 474 U.S. 1021, 106 S.Ct. 572, 88 L.Ed.2d 557 (1985).

 As the First Circuit has said, under this doctrine the "limitations clock is activated by knowledge, actual or constructive; it begins to tick when ... 'plaintiff knows, or reasonably should have known, of the acts constituting the union's alleged wrongdoing.'" *Arriaga–Zayas v. International Ladies' Garment Workers Union*, 835 F.2d 11, 13 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2016, 100 L.Ed.2d 604 (1988) (*quoting Graham v. Bay State Gas Co.*, 779 F.2d 93, 94 (1st Cir.1985)). Whether the plaintiff knew or should have known of the accrual of his cause of action is a question of fact. *King*, 785 F.2d at 34. *See also Chrysler Workers*, 834 F.2d at 578–79 (holding that disputed facts concerning knowledge of union activities may bar summary judgment on *DelCostello* grounds). Similarly, whether a collective bargaining agreement allows plaintiff to be charged with sufficient knowledge to begin the time limit is also a question of fact. *King*, 785 F.2d at 34 (*citing Schum v. South Buffalo Railway*, 496 F.2d 328, 331 & n. 4 (2d Cir.1974)).

 There are some general problems with applying the discovery rule to a "*DelCostello*/hybrid-suit" situation. The expiration of the *DelCostello* limit, like all such time bars, is an affirmative defense. *Farr v. H.K. Porter Co., Inc.*, 787 F.2d 1014, 1016 (5th Cir.1986); *Peterson v. Air Line Pilots Ass'n. Int'l.*, 759 F.2d 1161, 1164 (4th Cir.1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). The defendant, therefore, normally has the burden of establishing its application. *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 487 (3d Cir.1985); *Melhorn v. AMREP Corp.*, 373 F.Supp. 1378, 1380 (M.D.Pa.1974).

On the other hand, the "discovery doctrine" was originally an exception to the general rule. *See Ciccarelli*, 757 F.2d at 553 (discussing the nature of the doctrine). There appears to be no case which clearly discusses the issue of the burden of proof in this context, but several decisions seem to have used this "exceptional" aspect to require that a plaintiff demonstrate his conformity with *DelCostello's* six-month period. *See Clift v. U.A.W.*, 818 F.2d 623, 629–30 (7th Cir.1987) (holding that plaintiffs in suits governed by *DelCostello* limit must prove timeliness of action); *Adkins*,

---

**5.** Another use of the word "appear" would allow the formula to articulately and logically bar a hybrid suit *even though* the union had not yet violated plaintiff's rights, because a "reasonable person" would have thought the union had done so. This would require hybrid plaintiffs to sue their unions within six months from the date upon which they first apprehend that their reliance on the union may well be futile. As the Third Circuit has stated, such an imposition conflicts with the policy of encouraging reliance on labor unions, and would unjustifiably force those whose rights the union exercises to "clog the federal courts with premature, defensive lawsuits." *Childs v. Pennsylvania Fed'n. Bhd. of Maintenance Way Employees*, 831 F.2d 429, 436 (3d Cir.1987). Moreover, a calculation based on an impression of legal futility would run afoul of the Supreme Court's holding in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) that the discovery exception cannot be made to run from the date of legal, as opposed to factual, knowledge. *Id.* at 122, 123–24, 100 S.Ct. at 359–360.

769 F.2d at 335, *aff'g.*, *Adkins v. General Motors Corp.*, 573 F.Supp. 1188, 1192–93 (S.D. Ohio 1983) (appearing to require hybrid plaintiff to demonstrate compliance with *DelCostello*). *Cf. Van Buskirk*, 760 F.2d at 487 *and Melhorn*, 373 F.Supp. at 1380 (applying burden under general discovery rule). Therefore, although the discovery principle has supplanted the "date of violation" rule as the true measure for *DelCostello's* time limit, *see, e.g., Proudfoot*, 779 F.2d at 1559 (describing discovery exception as the "general rule" for *DelCostello* computations), a hybrid plaintiff still bears the burden of establishing a favorable date of discovery. He "carries the burden of proof" and "all presumptions are against him." *N.L.R.B. v. Don Burgess Constr. Corp.*, 596 F.2d 378, 383 n. 2 (9th Cir.1979), *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979) (applying general discovery principle).

Where a hybrid defendant moves for summary judgment this result is, perhaps, academic. A summary judgment motion brought by a hybrid plaintiff, on the other hand, would appear subject to a *de facto* incorporation of *DelCostello* compliance as an element of his claim. As a result, a hybrid defendant could simply incant the statute of limitations and require plaintiff to negate what is properly an affirmative defense. In order to avoid difficulties in applying Fed.R.Civ.P. 56 a clearer description of the burden of proof may well be needed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986) (holding that movant need not negate affirmative defense).

In particular reference to this case, the application of the discovery rule to a hybrid suit may be extremely difficult where the union was not forthcoming regarding its activities. The beginning of the *DelCostello* limit is easily ascertained when the collective bargaining agreement allows a plaintiff to calculate a date by which he may know whether his grievance has been well handled. For example, in *Metz, supra*, plaintiff complained that the union breached its duty of fair representation by refusing to file her grievance. She filed suit almost thirteen months after submitting her grievance to the union. The collective bargaining agreement required grievances to be filed within five days and that, if the union decided to forego filing, all proceedings must have ended within twenty-three days from that date. The court of appeals held that the *DelCostello* time period barred plaintiff's suit, in part because the agreement provided a ready date by which she could have known that her rights had accrued. *Metz*, 715 F.2d at 304.

The discovery rule becomes onerous when, as here, the facts display complete union indifference in the light of an agreement which sets no certain date by which the plaintiff can know whether his grievance has been properly taken up by the union. A hybrid plaintiff would be required to explore the informational vacuum created by his contract and union silence in order to "discover" that moment when "the grievance procedure was exhausted or otherwise broke down to [his] disadvantage." *Proudfoot*, 779 F.2d at 1559. Such cases illustrate Judge Becker's concern that "union officials may well be equivocal or contradictory in their communications.... As a result, the potential suitor will not know when exhaustion is futile." *Scott*, 725 F.2d at 230. (Becker, J., concurring).[6]

Moreover, an organization's silence may prompt a worker to rely on "what he thought were genuine internal remedies," only to discover at some later date, and usually through a court's opinion, that his "remedies were illusory," and that his com-

---

**6.** Judge Becker directed his observations to communications between union representatives and plaintiff. The court, however, thinks them equally applicable to the most important communication of all, namely the collective bargaining agreement. A union has a "pivotal role" in the grievance process, for the organization has the sole initial authority to exercise plaintiff's rights under the agreement, and because of the important role which it has in supervising the grievance proceeding. *Bowen v. United States Postal Serv.*, 459 U.S. 212, 225 & n. 14, 103 S.Ct. 588, 596 & n. 14, (1983). Where a union chooses to remain silent about the proceedings, the collective bargaining agreement may well be the only way in which a member can determine when his "hybrid" rights have accrued.

plaint is "forever barred." *Scott*, 725 F.2d at 231 (Becker, J., concurring). The only present remedy for this situation is to "file numerous precautionary lawsuits ... in the hopes that perhaps one of the suits will have been timed correctly." *Id.* Given the enormous power that union management has over labor, a plaintiff ought not be forced to choose between being victimized by union neglect and commencing suits which might turn his most powerful ally into a formidable enemy. *Id.*

There are several possible responses to these problems. One is requiring unions to comply with such notice requirements as are contained in their bylaws or constitutions. As noted above, due process concepts have already been extended to the organizations; a requirement that they fulfill their own promises hardly seems unfair. This solution, however, would be cold comfort to a plaintiff whose union did not have such requirements. As Judge Becker pointed out in *Scott*, "those with a grievance against their union arising out of some breach of the duty of fair representation are not likely to have possessed the power to bring about fair and clear internal union procedures." *Scott*, 725 F.2d at 231 (Becker, J., concurring).

A second approach is suggested by *Frandsen v. Brotherhood of Ry. Airline & S.S. Clerks*, 782 F.2d 674 (7th Cir.1986). In addressing an argument that a worker's suit was barred by *DelCostello*, the Seventh Circuit described the employee's dilemma thusly:

If the employee does not exhaust internal union remedies, he can be certain that the defendant union will argue that this requires dismissal of the action. On the other hand, if the employee does pursue those remedies, he knows that the union will argue that exhaustion would have been futile, and therefore that the statute of limitations should not be tolled during the time it took the employee to exhaust.

*Id.* at 681. The Seventh Circuit held that the *DelCostello* limit would be tolled "by the pursuit of internal union remedies, even where those remedies are ultimately determined to have been futile." *Id. And see Lewis*, 826 F.2d at 1318 (applying same rule to suit under 29 U.S.C. sections 160(b) and 301(a) for union violation of its own constitution). Niether *Frandsen* nor *Lewis* involved a hybrid action, but they suggest a rule whereby the *DelCostello* statute would be tolled until some formal conclusion of the grievance proceeding is reached.

A similar (and, the court thinks, better) proposal was given by Judge Becker in *Scott*:

[A] defendant in a *Vaca v. Sipes*-style suit ... should be able to ... start the *DelCostello* statute of limitations running only from the time that the employee has received from it a clear, written statement telling him that further internal appeals are futile, and the time for judicial action has begun.... Alternatively—and I believe equivalently—the union may start the statute of limitations running by waiving (in equally express terms) any reliance on its right under *Clayton* to bar suits for the failure of the employee to exhaust internal union remedies.

*Id.* (Becker, J., concurring). This rule would give a hybrid plaintiff a clear announcement of his rights irrespective of contradictory union communications; an ambiguous collective bargaining agreement; or union unresponsiveness. The adoption of such a rule would completely remove the problems created by any of these elements, as well as prevent the unseemly use of a union's own misbehavior to exempt it from legal responsibility.

It could be objected that this rule would fall prey to the federal policy of encouraging private resolution of labor disputes. Judge Becker's rule could be characterized as prohibiting hybrid suits until the sending of a "right to sue" letter, thereby in effect tolling *DelCostello's* limit until some point after which the union could not successfully argue that concern for these procedures is justified. This argument would conclude that Judge Becker does little more than formalize the present rule for hybrid-suit accrual, which would place court, de-

fendant and plaintiff back where they started.

This objection would result from a misunderstanding of Judge Becker's concurrence. It is important to note that Judge Becker did not express his proposal as a prerequisite to plaintiff's commencement of the action, but as a *limit on the defendant's ability* to invoke the *DelCostello* time-bar in the face of the organization's own confusing or uninformative conduct. The "futility" exception, like the concept of the breach of the duty of fair representation, would be available throughout any period. The defendant's access to the time-bar defense, however, would depend on how forthright it is with its aggrieved member.

The adoption of this rule would also harmonize this aspect of the law with the entire trend of labor law. Courts throughout the last sixty years have noted the enormous power which the law grants labor organizations and it has been required that unions, in return for such power, respond to fundamental concepts of good faith and fair dealing. It should be noted that the hybrid suit is an essential element in policing this *quid pro quo;* the satisfaction of an injured worker's rights is also an important element of "industrial peace." *Phelps Dodge,* 313 U.S. at 183, 61 S.Ct. at 847 (1941). Nor would this imposition usurp Congress' prerogatives over labor law. The "union half" of a hybrid suit is a judicially created cause of action, and therefore subject to changing concepts of the union's place in national life. The development urged here would do little more than bring the hybrid suit into line with the general requirements currently placed on union activity.

No court, however, has taken any of these steps. Therefore, the court turns to the question presented by AMLU's motion: When did Balsavage discover or, with due diligence should he have discovered, AMLU's alleged breach? *Hersh,* 789 F.2d at 232. AMLU contends that the provisions of the collective bargaining agreement, its own silence and Balsavage's impression demonstrate that no reasonable jury could conclude that this point was within six months of his complaint. An examination of the evidence, however, demonstrates that AMLU's motion must be denied.

The discovery rule focuses on the accumulation of the factual elements which allegedly entitle plaintiff to relief. *Id.; Shapiro,* 762 F.2d at 51; *Metz,* 715 F.2d at 304. *Cf. Childs,* 831 F.2d at 436 (stating that *DelCostello,* when applied to suit under Railway Labor Act, begins when facts entitle plaintiff to relief). In applying the rule, the court must bear in mind that:

> [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Clarity demands that the court begin its evaluation with an analysis of the collective bargaining agreement.

The agreement contains two articles which may apply to Balsavage's situation. The first is Article X, which is captioned "Suspension and Discharge." Exhibit E to Certification of Patricia McConnell, Esq. Article X requires Ryder to notify AMLU of the suspension or discharge of an employee, and provides that:

> Should there be any question raised regarding a suspension or discharge the Employer and the Union agree that the employee suspended or discharged will be given a hearing before representative [*sic*] of the Employer and a representative of the Union within two (2) days for a discussion regarding the suspension or discharge.

*Id.* Although this provision requires a hearing to be held "within two (2) days," it is silent as to when the forty-eight hour period begins.

The second provision is Article XI, which states that it covers the "Grievance Procedure." *Id.* Article XI requires the employee to "take up his grievance with his immediate foreman within twenty-four hours af-

ter the occurrence of such grievance." *Id.* The two have ninety-six hours from the time the grievance occurred to settle the dispute. If they cannot agree someone (Article XI does not say who) shall reduce the grievance to writing and serve it on the shop steward and Ryder. After an unspecified period of time, the steward and a Ryder representative "shall endeavor to settle said dispute." *Id.* AMLU becomes involved only if, after another unspecified length of time, the steward and Ryder cannot reach an agreement. Should Ryder and AMLU be incapable of resolving the matter informally, "the dispute shall be submitted to arbitration within five (5) days." *Id.*

If this agreement was not written to confuse an employee, it is difficult to imagine how it could be better drafted to do so. A discharged employee does not know whether his rights are governed by Article X, Article XI or some combination of the two. Even were that unclarity removed, the document's two deadlines, namely, "within two (2) days" and "within five (5) days," *id.*, are unaccompanied by the slightest indication of when, if ever, they begin. Under Articles X and XI, therefore, Balsavage's grievance could still be wending its way through AMLU's bureaucracy to eventual arbitration.

This ambiguity was accompanied by AMLU's complete silence to Balsavage's inquiries. Balsavage's belief that the union had decided to do nothing regarding his grievance is evidence from which a jury could find that his action had accrued. *Chrysler Workers,* 834 F.2d at 579. Balsavage was familiar with the terms and conditions of the collective bargaining agreement and had pursued a past grievance. Deposition of Balsavage, p. 113–14. His actions, however, may be fully evaluated only in light of Scarfi's promise that AMLU would (and, by implication could)[7] arbitrate his grievance.

Moreover, Balsavage's impression does not trigger the accrual of his hybrid suit; rather, the union creates the lawsuit by its miscreant handling of his rights in the face of a breach of the collective bargaining agreement. *Mitchell,* 451 U.S. at 62, 101 S.Ct. at 1563 (holding that the Union's breach of duty is an "indispensible predicate" to suit). The issue is whether Balsavage may be charged with knowledge of an event, namely, the union's breach of its duty of fair representation. *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359; *Ciccarelli,* 757 F.2d, 553; *Kronfeld,* 638 F.Supp. at 1474. Unlike the agreement discussed in *Metz, supra,* the contract does not provide a certain date which would allow the court to charge Balsavage with knowledge of a fact under Fed.R.Civ.P. 56. With the exception of its own silence, AMLU has not pointed to any other evidence in the record which displays such a breach. Granting summary judgment on this record would be tantamount to charging Balsavage with "knowledge" of an event that has not been proved to have taken place.

■ AMLU is correct in pointing out that the discovery rule places Balsavage under a duty to exercise due diligence regarding his claim before the union. *Hersh,* 789 F.2d at 232. Due diligence means familiarity with the collective bargaining agreement, and the making of such inquiries as would be reasonably calculated to acquire the pertinent information concerning the union's breach. *Demars,* 779 F.2d at 99.[8] Here, Balsavage's attempts to communicate with the union were ignored until June of 1986. The union attempts to make much from the fact that Balsavage ceased attempting to contact defendant after that time. As *Demars* makes clear, however, a hybrid plaintiff's inquiry must

---

**7.** It has long been recognized that " '[n]ormally employees do not have the expertise, knowledge or experience to interpret the complicated substantive and procedural provisions of a collective bargaining agreement.' " *King,* 785 F.2d at 34 (*quoting Schum,* 496 F.2d at 331 & n. 4). A reasonable factfinder could well interpret Scarfi's promise with this consideration in mind.

**8.** As the *Demars* court noted, "due diligence" does not require "anything particularly difficult, costly, or time-consuming. A simple phone-call could ... produce[ ] the relevant information." *Demars,* 779 F.2d at 99.

**474**

be capable of producing "relevant *information.*" *Id.* (emphasis supplied). AMLU has not demonstrated the absence of a genuine issue of material fact as to whether there was information to be had from it after June, 1986. The court cannot hold that reasonable diligence would have uncovered that which has not even been proven to exist.

AMLU's motion for summary judgment is denied.[9] It follows that the court cannot agree with defendant that Balsavage or his attorney have engaged in "improper and dilatory conduct." Brief in Support, p. 6. AMLU's motion for sanctions, therefore, is also denied. No costs.

---

9. AMLU incorrectly contends that this decision requires the dismissal of Balsavage's complaint. This opinion only decides whether, on this record, a reasonable factfinder would be compelled to charge Balsavage with knowledge of AMLU's alleged breach at a point in time more than six months before plaintiff commenced his suit. To hold that a reasonable trier of fact could conclude that the action is timely is not to conclude that the union has not breached its duty of fair representation.