930 F.2d 376
 137 L.R.R.M. (BNA) 2059, 118 Lab.Cas. P 10,673
 Herman WALKER; Bradley Colesworthy; Tera B. Slaughter;
Thomas Dillon, Plaintiffs-Appellees,
v.
CONSOLIDATED FREIGHTWAYS, INC.; Transcon, Inc.; PIE
Nationwide, Defendants-Appellants,
and
Teamsters Local No. 71; Teamsters Local No. 28; Teamsters
Local No. 61; Teamsters Local No. 391; Teamsters Local No.
509; Teamsters Joint Council No. 9; Trucking Management,
Inc.; Carolina Trucking Association, Inc., Defendants.
Herman WALKER; Bradley Colesworthy; Tera B. Slaughter;
Thomas Dillon, Plaintiffs-Appellees,
v.
Teamsters Local No. 71, Defendant-Appellant,
and
CONSOLIDATED FREIGHTWAYS, INC.; Transcon, Inc.; PIE
Nationwide; Teamsters Local No. 28; Teamsters Local No.
61; Teamsters Local No. 391; Teamsters Local No. 509;
Teamsters Joint Council No. 9; Trucking Management, Inc.;
Carolina Trucking Association, Inc., Defendants.
 Nos. 89-1041, 89-1044.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 6, 1990.
Decided April 11, 1991.
 
 Melvin R. Manning, Manning, Davis & Kirby, Richmond, Va. and Hugh J. Beins, Beins, Axelrod, Osborne & Mooney, P.C., Washington, D.C., argued (F. William Kirby, Manning, Davis & Kirby, Richmond, Va. and Jonathan G. Axelrod, Beins, Axelrod, Osborne & Mooney, P.C., Washington, D.C., on brief), for defendants-appellants.
 Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., argued (Edward G. Connette, III, Gillespie, Lesesne & Connette, Charlotte, N.C. and Julie Fosbinder, Tucson, Ariz., on brief), for plaintiffs-appellees.
 Before HALL, SPROUSE and WILKINS, Circuit Judges.
 K.K. HALL, Circuit Judge:
 
 
 1
 Plaintiffs, Herman Walker, Bradley Colesworthy, Tera Slaughter, and Thomas Dillon, are truck drivers who are represented by Teamsters Union Local No. 71. They initiated this action below against their employers, their union, and several different locals, alleging that their employers had breached their collective bargaining agreement by not timely implementing a new mileage measuring system and that the union had breached its duty to fairly represent them by agreeing to a contract modification without the assent of the union members. Plaintiffs seek to have the relevant provision of their collective bargaining agreement applied retroactively to December 1, 1985, rather than to May 4, 1986. The court certified a class of over-the-road truck drivers represented by the named plaintiffs and, following a bench trial, ruled that Local 71 had breached its duty of fair representation to the class. The court also held that three trucking companies--Consolidated Freightways, Inc., Transcon, Inc., and PIE Nationwide--had breached their collective bargaining agreement with the plaintiff class. The union and the employers appeal. We affirm in part and reverse in part.
 
 I.
 
 2
 This dispute arose in North Carolina, where the defendant trucking companies have freight terminals. Two collective bargaining agreements govern the parties' working relationship: the National Master Freight Agreement (NMFA) and the Carolina Over-The-Road Supplemental Agreement (Carolina Supplement).[1] Under these agreements, drivers' wages are calculated by applying a negotiated mileage rate to the number of miles driven. Historically, distances were measured between specified places within cities, called "zero mileage points." The distance between zero mileage points was often called "post office to post office" mileage or "AAA" mileage, because the "zero mileage point" for many cities was located at the post office and American Automobile Association figures were used for guidance. Prior to 1985, any dispute about the proper mileage was resolved under Article 52, section 2 of the Carolina Supplement, entitled "Mileage Determination." That section required that disputes be submitted to the Joint Bi-State Area Committee (Bi-State Committee), a body composed of an equal number of union and employer representatives and created to resolve contract disputes arising under the Carolina Supplement.
 
 
 3
 In March 1985, the 1982-1985 NMFA and Carolina Supplement expired. Soon thereafter, the union and employers negotiated a new agreement, which union members ratified on May 17, 1985.[2] Pursuant to this new agreement, the mileage system was to change from "post office-to-post office" to "terminal-to-terminal," under which drivers would be paid for mileage from the gate of the terminal of origin to the gate of the terminal of destination. Sections 2 and 3 of Article 52 of the Carolina Supplement incorporated this change. They provide:
 
 
 4
 Section 2. Mileage Determination.
 
 
 5
 Mileage shall be computed on official AAA mileage. Where a dispute arises, it shall be filed with the Bi-State Grievance Committee. The Employer and the Union shall then jointly log the mileage from terminal to terminal, and the results reported to the Bi-State Grievance Committee. Once this mileage is established, it shall immediately be applied to all runs operated over that particular route by all Employers operating between those two points. No Employer shall change its present mileage pay until the above procedure has been followed, unless such change is agreed to by the Local Union involved. The speedometer of any measuring automobile must be calibrated prior to any measurement. Any change in mileage resulting from the above procedure shall not result in any retroactive pay to a driver or refund from a driver.
 
 
 6
 Section 3. Mileage Adjustment.
 
 
 7
 Within six (6) months of the effective date of this Agreement, the parties will convert the mileage from zero point to terminal by jointly checking the miles to each terminal. It is understood the parties will establish a common checkpoint outside the terminal city and determine the difference in distance between the zero point and the terminal. Once the difference is established, the mileages will be adjusted. It is further understood that any disputed over-the-road mileage between points will also be determined.
 
 
 8
 Certain drivers believed that previously-accepted "trunk" miles were inaccurate and needed to be measured along with the measurement of "spur" miles.[3] The employers disagreed, believing that only "spur" miles needed to be calibrated. These drivers resolved their dilemma by claiming a disagreement over all the lines between all cities covered by the Carolina Supplement, thus creating the "dispute" needed to implicate sections 2 and 3 of the contract calling for the determination of "disputed" trunk distances. On September 4, 1985, Charles Williams, a member of Local 391, filed a grievance that placed all such miles in dispute, thereby initiating a procedure that would decide the correct mileage for all trunk routes covered by the Carolina Supplement.[4] Williams admittedly initiated the grievance with the sole objective of having all such distances measured.
 
 
 9
 In response to Williams' grievance, the Carolina Negotiating Committee, composed of an equal number of union and employer representatives, met on September 9, 1985, and named a Mileage Subcommittee to begin the work of calibrating all trunk and spur miles. The Negotiating Committee, however, elected to measure trunk miles first. The Negotiating Committee also established guidelines for the Subcommittee's work. These guidelines provided, in part:
 
 
 10
 [The Mileage Subcommittee w]ill submit completed mileage checks to the Bi-State Committee on November 20 and such mileages are to be implemented by the carriers on December 1. Mileage checks completed after November 20 will be submitted to the Bi-State on a monthly basis.
 
 
 11
 Shortly before September 25, 1985, Conrad Sides, President of Local 71, invited all Local 71 road stewards to discuss the Negotiating Committee guidelines. At this meeting, no one objected to any guideline.
 
 
 12
 Mileage calibration began on October 21, one month before the calculations were scheduled for submission to the Bi-State Committee. The calibration task evolved into a difficult and lengthy project and was not completed by December 1, 1985.
 
 
 13
 On February 17, 1986, Herman Walker, a member of Local 71 and a shop steward for Consolidated Freightways' road drivers, filed a "class action grievance" on behalf of all over-the-road drivers covered by the Carolina Supplement. His grievance stated that the employers had not implemented the new mileage figures and requested that carriers be required to pay drivers retroactively to December 1, 1985, under the terminal-to-terminal system. One week later, Walker filed a related grievance, formally asking to receive notice of and to attend the hearing on his February 17, 1986, grievance.
 
 
 14
 On March 20, 1986, the Bi-State Committee received and accepted the report of the Mileage Subcommittee. The record of the proceedings reveals no specific discussion of the grievances filed by either Williams or Walker. At this meeting, however, the Bi-State Committee entered the following decision: "[m]ileages are accepted as submitted and shall be effective May 4,J1986."[5]
 
 
 15
 On May 9, 1986, Local 71 submitted Walker's grievances to the Bi-State Committee, summarized as follows:
 
 
 16
 On September 9, 1985, the Carolina Negotiating Committee met to set forth rules, regulations, and guidelines that were to be followed in logging miles from terminal to terminal. It was agreed the mileage checks would be submitted to the Bi-State Grievance Committee on November 20, 1985 and implemented by all carriers on December 1, 1985. The Union is requesting all new mileage figures be rolled back to and paid to all drivers retroactive to December 1, 1985 just as the carriers agreed to on September 9, 1985.
 
 
 17
 On May 12, after terminal-to-terminal mileage went into effect, Walker filed another grievance on behalf of himself and forty-one other drivers, again requesting the new mileage figures be applied retroactively to December 1, 1985. In July 1986, Walker filed an additional grievance protesting the mileage figures used by Consolidated Freightways and protesting Consolidated's delay until June 29, 1986, in implementing the new mileage figures.
 
 
 18
 On September 16, 1986, the Bi-State Committee heard Walker's grievances. At this proceeding, Walker, who was represented by Local 71's business agent, conceded that Consolidated had implemented terminal-to-terminal mileage with payments retroactive to May 4, 1986. However, he asserted that recalculated mileage should be applied retroactively to December 1, 1985. The Bi-State Committee disagreed, concluding:
 
 
 19
 Based on the evidence that the Company is in compliance with Article 52, Section 2 and the decision of this committee [on March 20, 1986] and further that the minutes of the September 9, 1985 meeting of the Carolina Negotiating Committee are merely guidelines, the claim is denied.
 
 
 20
 In short, Walker's grievances failed to result in a longer retroactive pay period.
 
 II.
 
 21
 On October 14, 1986, Walker, Slaughter, Dillon, and Colesworthy filed this action against Local 71, Consolidated Freightways, Transcon, PIE Nationwide, and others.[6] They alleged (1) breach of the union's duty of fair representation, (2) breach of the collective bargaining agreement by their employers, (3) violations of Section 301 of the Labor-Management Relations Act, and (4) violations of Section 101(a) of the Labor-Management Reporting and Disclosure Act (LMRDA).[7]
 
 
 22
 After a bench trial in May 1988, the district court summed up the basis of the dispute, stating:
 
 
 23
 The heart of the controversy is allegations and evidence that the union, Teamsters Local No. 71, agreed to changes in plaintiffs' collective bargaining agreement without giving affected union members their right to vote on those modifications.
 
 
 24
 Reduced to its essentials, the district court's decision held that the Bi-State Committee's action constituted an amendment, not an interpretation, of the collective bargaining agreement. 714 F.Supp. 178. According to the court, "[t]he plain language of Article 52, Sec. 3 [of the Carolina Supplement] required that the new mileage system be put into effect within six months of contract ratification, or by December 1, 1985." Therefore, the district court determined that the Bi-State Committee exceeded its arbitral authority when it modified the contract to allow the employers to implement the new mileage system after December 1, 1985. As a result, the district court concluded that the union breached its duty of fair representation to its members when it assented to this "renegotiation of the collective bargaining agreement" without seeking approval or ratification from its union members.[8]
 
 
 25
 In addition, the district court held that Local 71 violated its duty of fair representation when it "failed to seek timely implementation" of the mileage provisions; when it "negligently delegated [its] duties to the mileage subcommittee"; when it "failed to raise the issue of pay" when it became clear that the calibration would not be completed on schedule; and when it delayed processing Walker's grievances. Concomitantly, the court held that the employers had breached the collective bargaining agreement, and entered judgment ordering the employers "to pay back pay based upon gate-to-gate mileage to affected drivers retroactive to December 1,1985."
 
 III.
 
 26
 In concluding that the Bi-State Committee's decision constituted an amendment of the Carolina Supplement, the district court acknowledged that an arbitral body[9] has authority to interpret a contract. It held, however, that the Bi-State Committee rewrote, rather than interpreted, express terms of the contract. We agree.
 
 
 27
 Courts, of course, cannot normally disturb an arbitral finding that draws its essence from the governing collective bargaining contract. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). Merely because a court finds that the arbitrator has seriously misconstrued a contract is not a sufficient reason to set aside an arbitrator's decision. Id. This rule reflects the strong federal policy that private resolutions of labor disputes are favored. Id.
 
 
 28
 The court found that the language of Section 3 unequivocally states that the mileages will be implemented within six months of the agreement's effective date. The implementation delay was provided to allow time to recalculate the mileages, but even if the mileages were not recalculated by the end of six months, they were to be effective then.
 
 
 29
 The court also found that the language of the Contract makes no distinction between spur and trunk miles and allows for no deviation from the six-month effective date in order for both to be measured. The terms "trunk" and "spur" were first used in the Committee meeting on September 9, 1985, and the Committee elected to measure both. Though the Bi-State Committee is not empowered to modify or amend the provisions of the collective bargaining agreement, the mileage report, as submitted, did not contain any request for interpretation of the agreement. The Committee ruled merely that "the mileages are accepted as submitted and shall be effective May 4, 1986." We concur in the district court's conclusion that the Committee's decision did not "draw its essence" from the collective bargaining agreement. Thus, the Committee's decision amounted to a modification of the contract, rather than a permissible interpretation.
 
 
 30
 Local 71 was represented on the Bi-State Committee by Ken Bowman, its business agent. Though Bowman participated in the March 20, 1986, Committee decision, he made no argument that the pay for terminal-to-terminal mileage should be made retroactive to December 1, 1985. Therefore, we affirm the district court's finding of a breach of duty to fairly represent based on its theory that the contract was amended rather than interpreted.
 
 IV.
 
 31
 The district court also found that Local 71 violated its duty of fair representation by: (1) failing to seek timely implementation of the provisions of the 1985 contract in a diligent fashion; (2) failing to submit the new May 4, 1986, implementation date to the membership for a vote; and (3) delaying Walker's grievance while simultaneously acquiescing in the new implementation date. Each of these grounds supports a claim of breach of duty to fairly represent.
 
 
 32
 We note that the standard for gauging a union's performance in this context has not varied greatly in the past decades. In Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), the Supreme Court stated that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." In Griffin v. Auto Workers, 469 F.2d 181, 183 (4th Cir.1972), we stated that "[w]ithout any hostile motive of discrimination and in complete good faith, a union may nevertheless pursue a course of action or inaction that is so unreasonable and arbitrary as to constitute a violation of the duty of fair representation."
 
 
 33
 In developing the standards articulated in Griffin, we later stated:
 
 
 34
 To sustain a member's action against his union under Griffin standards, it is not necessary that the union's breach be intentional. A union representative could be so indifferent to the rights of members or so grossly deficient in his conduct purporting to protect the rights of members that the conduct could be equated with arbitrary action.
 
 
 35
 Wyatt v. Interstate & Ocean Transp. Co., 623 F.2d 888, 891 (4th Cir.1980). Malicious or egregious delay in pursuing plaintiffs' rights can violate the Vaca proscription.
 
 
 36
 We find the evidence sufficient to support the district court's conclusions; therefore, we cannot overturn on appeal. Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). We affirm.
 
 V.
 
 37
 Finally, the employers argue that the district court erred in certifying the plaintiff class to include all drivers covered by the Carolina Supplement to the NMFA rather than just those represented by Local 71. We agree. Only employees represented by Local 71 have standing to sue it on the duty of fair representation and LMRDA Sec. 101(a) claims. Karo v. San Diego Symphony Orchestra Ass'n, 762 F.2d 819, 821 (9th Cir.1985). A local's duty of fair representation extends only to a class consisting of employees it represents. Chambers v. McLean Trucking Co., 550 F.Supp. 1335, 1345-46 (M.D.N.C.1982), aff'd, 701 F.2d 163 (4th Cir.), cert. denied, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983). Thus, employees not represented by Local 71 lack standing to sue it either directly or as part of a class action. The class, as certified, includes employees not represented by Local 71. It is, therefore, overbroad as to the above claims.
 
 
 38
 Moreover, in order to recover for breach of a collective bargaining agreement, employees must establish that they first attempted to exhaust the agreement's grievance procedure. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). The evidence shows that employees represented by Local 71 have met this requirement, but does not show that employees represented by other locals have.
 
 
 39
 Finally, the trial court dismissed all of the locals, other than Local 71, and as stated in the court's own findings of fact, the class is composed only of drivers within Local 71. Therefore, it was error to define the class to include members of other locals. We reverse the court's judgment as it applies to employees not represented by Local 71.
 
 
 40
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 41
 SPROUSE, Circuit Judge, concurring in part and dissenting in part:
 
 
 42
 I respectfully dissent from the conclusion reached in Parts III and IV of the majority's opinion and would reverse. I concur in Parts I, II, and although I would not have reached the issue discussed in Part V, in my view, it is correctly resolved.
 
 
 43
 The district court correctly acknowledged that an arbitral body[1] has authority to interpret a contract. It held, however, that the Bi-State Committee rewrote, rather than interpreted, express terms of the contract. The majority agrees with that conclusion, but I cannot.
 
 
 44
 The majority concedes that courts normally cannot disturb an arbitrable finding that draws its essence from the governing collective bargaining contract. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). As the Supreme Court stated:
 
 
 45
 [T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.
 
 
 46
 Misco, 484 U.S. at 38, 108 S.Ct. at 370. In holding that the arbitrator had not exceeded its authority, the Misco Court further stated that "[n]o dishonesty is alleged; only improvident, even silly, factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts." Id. at 39, 108 S.Ct. at 371.
 
 
 47
 Similarly, in United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the Supreme Court warned of the dangers of judicial intervention in an arbitration decision, stating:
 
 
 48
 Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final.
 
 
 49
 United Steelworkers, 363 U.S. at 598-99, 80 S.Ct. at 1361-62.
 
 
 50
 Application of the principles articulated in United Steelworkers and Misco compels me to disagree with the district court's conclusion that the grievance decision of March 20, 1986, did not draw its essence from the collective bargaining agreement. In arriving at this conclusion, I view differently the interpretative cohesiveness of sections 2 and 3. The former, virtually unchanged by the 1985 agreement, relates only to the measurement of distances between "zero mileage points." Significantly, this section provides that "[a]ny change in mileage resulting from the above procedure shall not result in any retroactive pay to a driver or refund from a driver." And, as previously stated by the majority, this section required actual measurement only when a dispute arose.
 
 
 51
 Section 3 states that, within six months, the parties must convert the mileage from zero point to terminal. Like section 2, section 3 also requires measurement of "over-the-road" mileage (from city to city) in the event of a dispute over the distance between specific cities. Plaintiffs contend that Williams' grievance mandated calibration of all miles and that pay adjustments not made within six months after the effective date of the Carolina Supplement were to be paid retroactively. This contention, however, also reveals an inherent tension between sections 2 and 3. Section 2 did not require retroactive application, but, as the plaintiffs would interpret it, section 3 does. In my view, the language of sections 2 and 3 spawning this dispute is sufficiently ambiguous to permit interpretation. It presents the kind of dispute normally resolved through the agreed grievance procedures.
 
 
 52
 The drivers argue nevertheless that there is no authority in the disputed sections for the action of the Bi-State Committee advancing the retroactive date from December 1985 to May 1986. For that matter, however, there is no specific language fixing a retroactive date in the first place. The language of section 2 contained in the 1985 agreement states that "[n]o Employer shall change its present mileage pay until the above procedure has been followed, unless such change is agreed to by the Local Union involved." Section 3, in reference to the calculation of "spur" miles, states that "[o]nce the difference is established, the mileages will be adjusted." The language of section 3 never specifically mandates retroactive pay adjustments, let alone a date for the adjustments.
 
 
 53
 While we might not necessarily agree with the Bi-State Committee's interpretation of the conflicting sections, "courts have no business overruling [an arbitrator] because their interpretation of the contract [or facts] is different from his." United Steelworkers, 363 U.S. at 599, 80 S.Ct. at 1362. The grievance machinery, as it was used here, falls considerably short of a perfect model. The mechanism employed for the resolution of mileage disputes, however, is one to which the union and employers have agreed in their collective bargaining contracts. Wise or unwise, efficient or inefficient, the parties' resolution of their dispute over the meaning of sections 2 and 3 of the collective bargaining agreement resulted in an arbitrable interpretation--not an amendment of the contract. Thus, in my view, the district court erred in concluding that the Committee's decision did not "draw its essence" from the collective bargaining agreement and in its finding of a breach of duty to fairly represent based on its theory that the contract was amended rather than interpreted.[2]
 
 
 54
 The district court also found that Local 71 violated its duty of fair representation by, in part, unnecessarily delaying the mileage calibration and by delaying the processing of Walker's grievance. I agree with the majority that the standard for gauging a union's performance in this context has not varied greatly in the past decades, and, of course, the majority correctly refers to the controlling principles of Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); Griffin v. Auto Workers, 469 F.2d 181, 183 (4th Cir.1972); and Wyatt v. Interstate & Ocean Transp. Co., 623 F.2d 888, 891 (4th Cir.1980).
 
 
 55
 Malicious or egregious delay in pursuing plaintiffs' rights could be considered evidence of perfunctory conduct, unreasonableness, or even bad faith so as to constitute arbitrary action violative of the Vaca proscription. Here, however, no mystery surrounds the delays, and no evidence demonstrates unreasonable attitudes, unreasonable approaches, or arbitrary action on the part of either the union or the employers. Plaintiffs concede that Local 71 consistently contended that the contract language required conversion to terminal-to-terminal pay within six months of ratification and the record discloses that Local 71 advanced that position with fidelity. Local 71 also consistently contended that calibration of all miles, not just spur miles, must be completed within six months. However, the need to calibrate all miles, a development not contemplated by section 3, contributed greatly to the delay in the calibration process. Moreover, Local 71 believed that section 3 required retroactive pay and, thus, it did not foresee a sense of urgency in completing the process.
 
 
 56
 If Local 71 had pursued a tack different from the one it chose, the conversion time may have been shortened and the new mileage implemented within the six-month period or, failing that, there may have been ways it could have produced an interpretation of the contract requiring a retroactive implementation to December 1, 1985. However, if these are failures on the part of the union, they do not rise to the level of bad faith and/or arbitrary action. As we stated in Ash:Simple negligence, ineffectiveness, or poor judgment is insufficient to establish a breach of the union's duty. Rather, the union's conduct must be "grossly deficient" or in reckless disregard of the member's rights....
 
 
 57
 ....
 
 
 58
 [A] flawless performance is not required to fulfill the union's duty.
 
 
 59
 Ash v. United Parcel Service, Inc., 800 F.2d 409, 411 (4th Cir.1986) (citations omitted). Moreover, we observed in Smith v. United Steelworkers of America, Local 7898, 834 F.2d 93, 96 (4th Cir.1987), "[a] union's exercise of its judgment need not appear as wise in the glaring light of hindsight, and a violation of the duty of fair representation is not made out by proof that the union made a mistake in judgment." Consequently, I would find no breach by the union as a result of the asserted delay.
 
 
 60
 Finally, in my view, plaintiffs' contention that Local 71 violated its duty by delaying Walker's grievance flies in the face of the stipulation of facts entered into by the parties.[3] Even without these admissions, no evidence suggests that the delays resulted from bad faith. Walker's grievances were interwoven with the ongoing procedures for pursuing the union's version of the meaning of sections 2 and 3 of the Carolina Supplement and securing to the advantage of its members the measurement of trunk miles. It is undisputed that Local 71 officials were as convinced as was Walker that the implementation date for the new mileage system should be retroactive to December 1, 1985. Nothing in the record indicates any reasons for the union to have deviated from that position. Consequently, I feel the district court also erred in finding a breach of the duty to fairly represent flowing from the delay in processing Walker's grievances.
 
 
 
 [1]
 The Carolina Supplement applies to most of the Teamsters' locals in the Carolinas
 
 
 [2]
 In addition, a "Stipulation and Agreement" provided that non-monetary provisions of the new agreement would not become effective until ten (10) days after notification of ratification was given to the motor carriers. Notification of ratification was given on or about May 17, 1985, resulting in an effectivity date of approximately May 27, 1985
 
 
 [3]
 "Trunk" miles are the distances between zero mileage points, and "spur" miles are the distances from the zero points to the terminals
 
 
 [4]
 Local 391, originally a party to the action, is not a party in this appeal. Williams' grievance, nevertheless, resolved the mileage measurement issue as to all involved locals, including Local 71
 
 
 [5]
 After the Bi-State Committee received the Mileage Subcommittee's report, members of the Bi-State Committee voiced their approval. The Bi-State Committee then went off the record before entering its decision
 
 
 [6]
 The complaint originally named as defendants Teamsters Locals 71, 28, 61, 391, and 509; Teamsters Joint Council No. 9; Consolidated Freightways, Transcon, Inc., and PIE Nationwide; and two employers' organizations, Trucking Management, Inc., and Carolina Trucking Association, Inc. The district court subsequently dismissed all the defendants except the three employers and Local 71. The dismissals are not at issue in this appeal
 
 
 [7]
 Internal union charges had been filed a month earlier, but the international union has not processed these claims pending the outcome of this litigation
 
 
 [8]
 The governing provision of the union constitution requires that any modification of an existing collective bargaining agreement be ratified by a majority vote of union members affected
 
 
 [9]
 It is uncontested that the Bi-State Committee is the responsible body designated by the collective bargaining agreement to process grievances
 
 
 [1]
 The majority acknowledges that the Bi-State Committee is the responsible body designated by the collective bargaining agreement to process grievances
 
 
 [2]
 Since, in my opinion, the contract had not been amended, it follows that the union did not violate either Section 301 of the Labor-Management Relations Act or Section 101(a) of the Labor-Management Reporting and Disclosure Act, as contended by the plaintiffs
 
 
 [3]
 Prior to trial, the parties entered into a stipulation of facts, which included the following:
 
 
 [77]
 The delay in processing Walker's grievance was explained by Bowman. He was sick and was operated on in both March and April 1986. He didn't meet with Jenkins of Consolidated until May, 1986, and he filed the grievance with the Bi-State Committee on May 9, 1986. The Committee didn't get to it in June; there was no meeting in July, and Bowman postponed it in August so that it could be heard as the first case in September, 1986
 
 
 [80]
 On or about August 11, 1986, Walker and Local 71 Business Agent Ken Bowman met at Local 71's office to discuss the submission of the grievances to the Bi-State Committee
 
 
 [81]
 Local 71 submitted the various Walker grievances to the Bi-State Committee on May 9, 1986. Local 71 summarized the grievances as follows:
 On September 9, 1985, the Carolina Negotiating Committee met to set forth rules, regulations, and guidelines that were to be followed in logging miles from terminal to terminal. It was agreed the mileage checks would be submitted to the Bi-State Grievance Committee on November 20, 1985 and implemented by all carriers on December 1, 1985. The Union is requesting all new mileage figures be rolled back to and paid to all drivers retroactive to December 1, 1985 just as the carriers agreed to on September 9, 1985.
 
 
 [84]
 Walker had the opportunity to introduce whatever documents he desired and to speak freely while presenting Local 71's case
 
 
 [85]
 Bowman did not do anything improper at the hearing on Case 259-R-86
 
 
 [93]
 Walker could not identify any facts of collusion between the Unions and the Employers
 
 
 [95]
 Walker does not accuse Sides, Bowman, or any official of Local 71 of any bad faith or wrongdoing in connection with the terminal-to-terminal implementation or his grievance or his representation at the Bi-State Committee hearing
 
 
 [96]
 The Plaintiffs know of no misconduct by Local 71 except not requiring the ratification vote
 
 
 [97]
 Up to the time of the Bi[-]State Decision on 9/16/86, Walker never complained or objected to Bowman about his representation or presentation to the Bi-State Committee
 
 
 [101]
 Local 71 President, Conrad Sides, was upset at the Bi-State Committee decision which made the mileage effective May 4, 1987. He said that the Committee was "out of their mind." Sides, like Bowman, always believed that the gate-to-gate should be effective December 1, 1985 in accordance with the Contract