**Wade CHAMBERS, et al., Plaintiffs,**

v.

**UNITED STEELWORKERS OF AMERICA, et al., Defendants.**

**No. C83–165Y.**

United States District Court,
N.D. Ohio, E.D.

Jan. 30, 1984.

Ray DeLost, John Dixon, Youngstown, Ohio, for plaintiffs.

Daniel P. Thomas, Warren, Ohio, Richard J. Brean, Asst. Gen. Counsel, United Steelworkers of America, Pittsburgh, Pa., Stuart O. Merz, Robert C. Weber and Fred N. Carmen, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

Plaintiffs, Wade W. Chambers, Robert N. Eshenbaugh, Clarence D. Rankin, Sr., Paul A. Loftus, James A. Parsons, Frank Galich, William J. Bailey, and David P. Benincase, filed the above-captioned case against defendants, United Steelworkers of America (The International Union), United Steelworkers of America Local 4211, and Jones & Laughlin Steel Corporation (J & L) alleging breach of the duty of fair representation and breach of the Collective Bar-

gaining Agreement. Jurisdiction is invoked pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1331. The Union and J & L filed motions for summary judgment. The issue before the Court is whether the displacement of plaintiffs from their positions as patrolmen at J & L's Campbell facility by patrolmen with greater seniority who were laid-off from J & L's Brier Hill facility, is a violation of the Collective Bargaining Agreement. For the reasons which follow, defendants' motions for summary judgment are granted.

## FACTS AND ISSUES

The following facts are undisputed by the parties: J & L is the successor to Youngstown Sheet and Tube, the original operator of the Campbell and Brier Hill facilities. In 1974, nine major steel companies, including Youngstown Sheet & Tube Company and J & L entered into a consent decree with the Departments of Justice & Labor and the Equal Employment Opportunity Commission to resolve claims of alleged employment discrimination on the basis of race and sex. In 1975, Youngstown Sheet & Tube Company entered into an agreement (implementing agreement) with the United Steelworkers Local 4211 to implement the consent decree. The implementing agreement provided for the reassignment of patrolmen at the Campbell and Brier Hill facilities in the event of a reduction in work force.

The consent decree established an Audit and Review Committee. The function of the Audit and Review Committee, among other things, is to review implementing agreements to assure compliance with the Consent Decree. The implementing agreement with Local 4211 was approved by the Audit and Review Committee.

Plaintiffs were patrolmen in the security department at the Campbell facility. The security department at the Brier Hill facility was closed in 1982. J & L and the Union assert that pursuant to the implementing agreement, senior patrolmen from the Brier Hill facility could displace patrolmen with less seniority at the Campbell facility.

Plaintiffs were patrolmen at the Campbell facility who were displaced by senior patrolmen from the Brier Hill facility.

Plaintiffs assert that pursuant to the implementing agreement, patrolmen from the Brier Hill facility could only displace employees in a patrolman-excess position at the Campbell facility. A patrolman-excess is an employee who is in the process of being trained for a regular security department position (patrolman) or who is filling temporary vacancies in the security department.

In May, 1982, plaintiffs filed a grievance with Local 4211 regarding the displacement of Campbell patrolmen by Brier Hill patrolmen. The grievance was discussed at a meeting of Local 4211 on May 12, 1982, however, no action was taken. The grievance was again discussed at a meeting of Local 4211 on June 9, 1983. At the June 9th meeting, plaintiffs were informed that the Union agreed with J & L's interpretation of the implementing agreement and therefore, the grievance would not be processed.

After plaintiffs were informed by Local 4211 that their grievance would not be processed, plaintiffs requested the Audit and Review Committee to review the Union and J & L's interpretation of the implementing agreement. On July 8, 1982, the Audit and Review Committee informed the plaintiffs it would take no action concerning their complaint. On August 3, 1982 plaintiffs again requested the Audit and Review Committee to review the decision of the Union and J & L. On October 21, 1982, the Audit and Review Committee again decided no action would be taken on the plaintiffs' complaint. On June 19, 1982, plaintiffs also petitioned United Steelworkers President Lloyd McBride to aid in a resolution. At a meeting on August 20, 1982 the plaintiffs were informed that the International Union would take no action on the grievance. On January 11, 1983, the plaintiffs filed their complaint in this action.

The defendants raise the following issues in their motions for summary judgment:

1.  Whether the plaintiffs' action is time-barred by the statute of limitations.

2.  Whether there are genuine issues of material fact regarding plaintiffs' allegations of bad faith against the Union for breach of the duty of fair representation.

3.  Whether there are genuine issues of material fact regarding plaintiffs' alleged wrongful lay-off due to the infusion of Brier Hill patrolmen into the Campbell facility.

## DISCUSSION AND LAW

1.  *Whether the plaintiffs' action is time-barred by the statute of limitations.*

■   Plaintiffs allege a breach of the Collective Bargaining Agreement by J & L and a breach of the duty of fair representation by the Local & International Union. Such an action is known as a hybrid action. There is a six month limitations period governing hybrid actions. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). The defendants assert that the period of limitations began to run on June 9, 1982 when union officials at Local 4211 informed the plaintiffs that they would not process their grievance. The plaintiffs assert that the period of limitations began to run on October 21, 1982 when the Audit and Review Committee decided they would not process the plaintiffs' complaint against the Union and J & L.

■   In *Clayton v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America,* 451 U.S. 679, 685, 101 S.Ct. 2088, 2093, 68 L.Ed.2d 538 (1981) the Supreme Court held that "where an internal union appeals procedure cannot result in reactivation of the employee's grievance or an award of the complete relief sought in his § 301 suit, exhaustion will not be required with respect to either the suit against the employer or the suit against the Union. *Id.* In *Clayton,* the Supreme Court decided at what point in the grievance process an employee could cease exhausting the contractual grievance procedures as required in

*Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) and proceed with § 301 action. Although *Clayton* did not deal with the issue of when internal grievance procedures are complete for the purpose of the commencement of the period of limitations, it follows that if an employee exhausts administrative remedies and may bring a § 301 suit, the limitations period commences. That is, the date an employee exhausts administrative remedies for the purpose of bringing a § 301 action is the same date the statute of limitations begins to run.

■   Whether the plaintiffs exhausted sufficiently their administrative remedies and the period of limitations commenced is dependent upon the Collective Bargaining Agreement. *Badon v. General Motors Corp.,* 679 F.2d 93, 98 (6th Cir.1982). Plaintiffs filed a joint grievance with Local 4211 pursuant to the Collective Bargaining Agreement; however, the Union refused to process the grievance and returned it to plaintiffs on June 9, 1982. At this point, plaintiffs exhausted their administrative remedies as required under the Collective Bargaining Agreement and could file a § 301 suit.

Plaintiffs assert that their petition to the Audit and Review Committee to review the refusal to process the grievance by Local 4211 tolled the period of limitations. While plaintiffs had the option to petition the Audit and Review Committee, such action was not required under the Collective Bargaining Agreement. The Audit and Review Committee was established under the consent decree to ensure its implementation. Consequently, plaintiffs' petitions to the Audit and Review Committee are not part of the grievance procedure as set forth in the Collective Bargaining Agreement and do not toll the period of limitations.

Plaintiffs petitioned the Audit and Review Committee and were informed no action would be taken on July 8, 1982. Plaintiffs petitioned the Audit and Review Committee again in August, 1982 and were informed no action would be taken on Octo-

ber 21, 1982. This is the date the plaintiffs assert the period of limitations commenced. Following plaintiffs' theory, they could postpone indefinitely the commencement of the period of limitations by continuing to petition the Audit and Review Committee. Such a result "would preclude the relatively rapid final resolution of labor disputes favored by federal law...." *DelCostello,* 462 U.S. at ___, 103 S.Ct. at 2292.

Furthermore, plaintiffs' letters to Lloyd McBride, President of the International Union, did not toll the period of limitations. In the letters to President McBride, plaintiffs invoked their rights under Article 9 of the Constitution of the International Union in requesting that sanctions be taken against the Local Union officers for refusing to process their grievance. Even if their appeals to President McBride were successful, their grievance would not be reactivated or the relief they sought would not be granted. *Clayton,* 451 U.S. at 685, 101 S.Ct. at 2093. Plaintiffs could file a § 301 action without petitioning the president of the International Union.

Accordingly, the period of limitations commenced in plaintiffs' hybrid action on June 9, 1982. The action is time-barred because it was not filed until January 11, 1983. Summary judgment is granted in favor of the defendants.

Because plaintiffs' action is barred by the statute of limitations, analysis on the remaining issues is not necessary. However, in the interest of judicial economy, the Court will resolve the two remaining issues.

2. *Whether there are genuine issues of material fact regarding plaintiffs' allegations against the Union for breach of the duty of fair representation.*

█ To succeed in an action alleging a breach of the duty of fair representation, the plaintiffs must prove the Union's conduct was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Simple negligence is insufficient to support a claim of breach of the duty of fair representation. *Ruzicka v. General*

*Motors Corp.,* 649 F.2d 1207, 1212 (6th Cir.1981). Employees do not have an absolute right to have a grievance taken to arbitration. *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917. Therefore, plaintiffs must prove that the Union acted in bad faith in refusing to process their grievance.

█ Robert Vasquez attests he was the staff representative of the International Union hired to service Local 4211. His duties included evaluating grievances and presenting those grievances to arbitration if arbitration was warranted. Vasquez attests that the plaintiffs' grievance was of great concern to members of Local 4211 and therefore, was given a great deal of consideration. Plaintiffs do not contest that their grievance was discussed extensively at two meetings of Local 4211 before the Local Union officers refused to process the grievance.

Vasquez attests further as follows:

My interpretation of the chart was fully supported by the past practice of the parties. Thus, during my entire tenure as staff representative, Brier Hill patrolmen who had been displaced exercised their plant continuous service to bump junior patrolmen at Campbell while Brier Hill patrolmen who possessed insufficient plant service to bump Campbell patrolmen were reduced to performing the fill-in duties of patrolmen-excess.

Vasquez' affidavit, ¶ 12.

In Vasques' tenure as staff representative, it was the practice under the Collective Bargaining Agreement to treat Brier Hill patrolmen and Campbell patrolmen as one unit for seniority purposes. The Sixth Circuit has held that the prevailing practice regarding the dispute at issue is persuasive as to whether a union was acting in bad faith when it refused to process a grievance. In *Ruzicka* the Court held:

the Union can articulate a sufficient legal rationale to justify the manner in which a grievance has been handled. Whatever the rationale, the standard against which it is judged should be uniform. A contrary conclusion would inject the Courts

into the process of second-guessing a union representative's decision and would undermine a union's ability to rely on prevailing practices.

*Ruzicka*, 649 F.2d 1212.

Because the prevailing practice under the Collective Bargaining Agreement had been to treat the Campbell and Brier Hill facilities as one unit for the purpose of patrolmen's seniority, the Union was not acting in bad faith when it refused process a grievance which was contrary to the prevailing practice.

Plaintiffs assert the opinion of Wayne Patrick, former President of Local 4211, supports their position that patrolmen from one facility could only displace employees at another facility at the patrolmen-excess level. However, plaintiffs raise no genuine issues of material fact regarding the alleged bad faith on the part of the Union. Assuming Patrick's interpretation of the Collective Bargaining Agreement is correct, negligence alone is insufficient to establish a claim of breach of the duty of fair representation against the Union.

■ Accordingly, the plaintiffs have failed to raise any genuine issues of material fact regarding their claim of breach of the duty of fair representation against the Union. Plaintiffs' action against the company cannot succeed if they cannot establish a breach of the duty of fair representation by the Union. *Hines v. Anchor Motor Freight*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976). Accordingly, summary judgment is granted in favor of the defendants.

3. *Whether there are genuine issues of material fact regarding plaintiffs' alleged wrongful lay-off due to the infusion of Brier Hill patrolmen into the Campbell facility.*

■ The parties agree that a chart negotiated by the Implementation Committee and incorporated into the implementing agreement, which outlines the promotional sequence at the Campbell and Brier Hill facilities for property protection employees, governs this dispute. *See* appendix 1. The chart is signed by G.L. Wuslich on behalf of Youngstown Sheet & Tube and Paul Botos on behalf of the Union. The chart lists the various property protection employee positions for the Campbell unit and the Brier Hill unit. A horizontal line connects the patrolmen positions of the Campbell unit and the Brier Hill unit. Another patrolmen position is listed between the Campbell patrolmen and the Brier Hill patrolmen at a lower level. The lower-level patrolmen position represents patrolmen-excess, who are patrolmen who are not permanently assigned or are patrolmen who have not completed training.

Paul Botos interprets the diagram of promotional sequence for plant protection employees as follows:

It was the intent of the Union, as well as the intent of YS & T, as conveyed to me by Mr. Wuslich, that under the implementing agreement in an instance of a reduction in force an employee reduced from his seniority sub-unit would exercise his plant continuous service to displace an employee with less plant continuous service in the other seniority sub-unit at the patrolman level. This intent is reflected by the presence of a line drawn between the two seniority sub-units at the patrolman level on the diagram appearing on the ninth page of Exhibit A to Mr. Wuslich's Affidavit, which line is a recognized means by which the parties indicate where movement between jobs occur. It was the further intent of the parties that the junior employee displaced from the patrolman position would then exercise his plant continuous service, if sufficient, to perform the duties of the patrolman excess position.

Botos Affidavit at ¶ 7.

Gary L. Wuslich interprets the diagram of promotional sequence for plant protection employees as follows:

It was the Company's intent, as well as the intent of the USWA as expressed to me by the Union Co-chairman, that the Implementing Agreement would provide

that, in the event of a reduction in force, an employee who was "reduced" from his seniority sub-unit would exercise his plant continuous service to displace a junior employee in the Patrolman position in the other seniority sub-unit. As indicated by the chart on page 9 of the Implementing Agreement (Exhibit A), that displaced employee would then exercise his plant continuous service to hold the Patrolman (Excess Force Job) if his plant continuous service with YS and T were sufficient.

In the Implementing Agreement, the Implementing Committee intended to provide, in the event of a reduction in force, for movement between the Brier Hill seniority sub-unit and Campbell seniority sub-unit at the Patrolman position. This intent was evidenced by the line on the chart (Exhibit A, page 9) between the two seniority sub-units at the "Patrolman" position, which meant that lateral movement between the seniority sub-units was contemplated at the Patrolman position—rather than the Patrolman (Excess Force Job). Indeed, the use of such a line "connecting" job positions in a Promotional Sequence or a Job Line of Progression is a recognized method of designating on that document where the movement between jobs occurs.

Wuslich Affidavit at ¶ 4 & 5.

William Maizel attests he was assistant superintendent of plant protection at J & L's Campbell facility from 1972 to 1978. Maizel attests he has been the superintendent since 1978. Maizel's observations of the practice of "bumping" at the patrolman level under the implementing agreement, from 1976 until 1982 when Brier Hill's security department was closed, supports Botos & Wuslich's interpretation of the agreement. Maizel attests:

In the period from 1976 until the Brier Hill sub-unit of the security department was shut down in 1982, security department employees from Campbell Works were moved to Brier Hill, and vice versa, as the need for security personnel arose. These moves were sometimes made on a daily and weekly basis, since reductions in force became a daily reality for J & L in the late 1970's. To the best of my knowledge and belief, in the case of a reduction in work force, every transfer that displaced security department employees at either the Brier Hill or Campbell sub-units occurred at the Patrolman level. This practice was in full accord with the Company's understanding of the implementing agreement entered into by Youngstown Sheet and Tube Company and Local 4211 and approved by the Audit and Review Committee (Docket 27–2). (J & L is the successor, by merger, to Y, S & T.)

Maizel affidavit at ¶ 3.

Both signatories to the agreement, as well as the practice of the parties, supports defendants' interpretation of the implementing agreement. That is, in the event of a reduction in work force, patrolmen at the Brier Hill facility could displace patrolmen at the Campbell facility with less seniority.

The only support plaintiffs offer for their interpretation of the agreement is the deposition testimony Wayne Patrick, former president of Local # 4211. Patrick testified that in the event of a reduction in work force, patrolmen at the Brier Hill facility could only displace patrolmen-excess at the Campbell facility. However, Patrick's testimony is insufficient to create a genuine issue of material fact.

While Patrick was involved in the implementing agreement negotiations, Botos and Wuslich signed the diagram of patrolmen promotional sequence. The signatories interpretation contradicts that of Patrick. Furthermore, Patrick's interpretation of the agreement is without support, because the practice of the parties to the agreement supports the defendants' view. "When the parties by their uniform conduct over a period of time have given a contract a particular construction, such construction will be adopted by the Courts." *Pekar v. Local Union No. 181*, 311 F.2d 628, 636 (6th Cir.1962); *cert. denied*, 373 U.S. 912,

83 S.Ct. 1303, 10 L.Ed.2d 414 (1963). *See also Cronin v. Sears, Roebuck & Company,* 588 F.2d 616, 618 (8th Cir.1978); *Barrett v. Safeway Stores, Inc.,* 538 F.2d 1311, 1314 (8th Cir.1976). Consequently, in view of the practice of the parties to the agreement and the interpretation of the signatories, there are no genuine issues of material fact regarding the ability of Brier Hill patrolmen to displace Campbell patrolmen with less seniority as provided in the implementing agreement.

## CONCLUSION

Accordingly, there are no genuine issues of material fact regarding plaintiffs' claims and summary judgment is granted in favor of the defendants because, as a matter of law:

1) plaintiffs' action is time-barred by the statute of limitations;

2) the Union did not act in bad faith in refusing to process plaintiffs' grievance; therefore, the Union did not breach the duty of fair representation; and

3) it was not a breach of the implementing agreement for patrolmen laid-off from the Brier Hill facility to displace patrolmen with less seniority at the Campbell facility.

IT IS SO ORDERED.

APPENDIX 1

YOUNGSTOWN SHEET & TUBE COMPANY

Department: Property Protection

A & R Docket No. ...
A & R Docket No. ...
A & R Docket No. ...

### CAMPBELL UNIT

Guide

Main Gateman First Aid

Main Gateman

Patrolman Gate

Patrolman

**Patrolman

### BRIER HILL UNIT

Main Gateman First Aid

Main Gateman

*Patrolman Gate

*Patrolman

*Patrolman accedes to Main Gateman position based on the applicable provisions of Article VII, Section 1 of the Basic Labor Agreement. If the Patrolman Gate position is implemented, the Patrolman shall progress through the Patrolman Gate job.

**Denotes those Patrolmen filling excess force jobs who have completed 520 hours for training purposes and have not bid into the Unit, and those Patrolmen filling excess force jobs who have not completed the required 520 hours training, and are not qualified to bid into the Unit. In case of a reduction of forces, demoted employees with the greatest Plant Continuous Service working at both Campbell and Brier Hill, shall be scheduled on this position in accordance with the applicable provisions of the Basic Labor Agreement covering decreases in forces or work.

Sequence and language modified: Sep 11, 1975--Plant Implementation Committee

G. L. Wuslich, Company
Chairman

P. Botos, Union
Chairman