Jerry W. VOLKMAN; Paul W. Will; Lyle W. Wade; Leroy G. Wells; Paul D. Cohan; Dennis P. Swiantek; William E. Donahue; Lonnie L. Schneider; Howard Howser; Charles Blackburn; and all others similarly situated, Plaintiffs,

and

Roger (Buckie) Moore; Richard L. Humble; Franklin A. Callaway; Phillip D. Brunow, Joseph F. Edwards; Lowell D. Molloy; L.D. Ward; Kenneth W. Brown, Plaintiffs–Appellants,

v.

UNITED TRANSPORTATION UNION; Fred A. Hardin, R.H. Arnett, as representatives of the United Transportation Union; St. Louis Southwestern Railway Company; Southern Pacific Company; Southern Pacific Transportation Company, Defendants–Appellees.

Nos. 93–3300, 93–3302, and 93–3303.

United States Court of Appeals, Tenth Circuit.

Jan. 11, 1996.

Bruce H. Stoltze, of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, Iowa, for appellants.

Norton N. Newborn, of Norton N. Newborn Co., L.P.A., Cleveland, Ohio, for appellee United Transportation Union.

Wayne M. Bolio and Robert S. Bogason of San Francisco, California, for appellee Southern Pacific Transportation Company.

Mark L. Bennett, Jr., and Ann Hoover, of Bennett & Dillon, of Topeka, Kansas, for appellee St. Louis Southwestern Railway Company.

Before BRISCOE, COFFIN,* and BARRETT, Circuit Judges.

* Honorable Frank M. Coffin, Senior Circuit Judge, United States Court of Appeals for the First Circuit, sitting by designation.

BRISCOE, Circuit Judge.

This is a class action by railroad workers formerly employed by the now defunct Chicago, Rock Island and Pacific Railroad (Rock Island), whose Tucumcari Line was acquired by St. Louis Southwestern Railway Co. (SSW), against defendants United Transportation Union (UTU), SSW, SSW's parent corporation Southern Pacific Transportation Co., and Southern Pacific's parent corporation Southern Pacific Co. In March 1980, SSW, other railroads acquiring portions of Rock Island, and labor organizations representing Rock Island employees entered into a labor protective agreement to protect the employment and seniority rights of Rock Island employees.

Plaintiffs alleged that under the agreement, they were entitled to preferential hiring and certain seniority rights from SSW on the Tucumcari Line, and that UTU breached its duty of fair representation in implementing the labor protective agreement. The district court found that UTU had breached its duty of fair representation, and that defendants had breached the labor protective agreement, but concluded only a small portion of the plaintiff class was entitled to relief.

Appellants are eight class members who worked for Rock Island on non-Tucumcari lines that shared a terminal with the Tucumcari Line. They were first hired by SSW to work on rehabilitation of the Tucumcari Line, and later worked as regular brakemen or conductors. These eight appellants appeal the district court's ruling that the labor protective agreement did not entitle former Rock Island employees who worked on non-Tucumcari lines to preferential hiring by SSW.

UTU and SSW cross-appealed the judgment entered in favor of the Tucumcari Line plaintiffs, but later settled with them and dismissed the cross-appeals. There are no cross-appeals pending. In their briefs, defendants raise errors of the district court only as alternative grounds for affirming the judgment.

The district court's findings of fact in *Volkman v. United Transp. Union*, 724 F.Supp. 1282 (D.Kan.1989), and 770 F.Supp. 1455 (D.Kan.1991), provide a clear and complete narrative of the events. We will set out a brief summary of the main events.

After the bankruptcy of Rock Island, SSW, with the approval of the Interstate Commerce Commission, acquired Rock Island's Tucumcari Line, which ran from New Mexico through Kansas City to St. Louis. This route is 400 miles shorter than SSW's El Paso to St. Louis route, the Corsicana Line, which ran south through Pine Bluff, Arkansas, and Corsicana, Texas, between Dallas and Houston. SSW renamed the Tucumcari Line the Kansas City Division, and the Corsicana Line became the Pine Bluff Division.

Under 49 U.S.C. § 11347, ICC was required to impose conditions to protect employees affected by the purchase of a railroad line by another railroad. ICC carried out that requirement by approving a March 4, 1980, labor protective agreement negotiated by UTU, other unions, SSW, and other railroads acquiring portions of the Rock Island and another bankrupt railroad. The agreement governed preferential hiring of Rock Island employees for positions resulting from SSW's acquisition of the Tucumcari Line, and required the parties to enter further agreements implementing its provisions. The implementing agreement between UTU and SSW was reached on February 23, 1982.

The Kansas City to St. Louis section of the Tucumcari Line was inoperable. Rather than repair it at great expense, SSW obtained permission from ICC in September 1982 to use Missouri Pacific Railroad track between Kansas City and St. Louis. In granting approval, ICC imposed labor protective conditions to protect SSW employees adversely affected by the acquisition. ICC required that SSW employees furloughed or dismissed because of the transaction be given priority in hiring for comparable positions, and that the railroad and unions attempt to reach an agreement for selecting the work force to handle traffic altered by the transaction. If no agreement was reached, ICC required the parties to submit disputed issues to arbitration. UTU and SSW reached a partial agreement and submitted other issues to arbitration. Traffic diverted from

the Corsicana Line began running over the Missouri Pacific track and the Tucumcari Line in January 1983.

It was in the interest of SSW Corsicana Line employees to obtain priority for as many jobs as possible. It was also in SSW's interest to give priority to its own furloughed employees because, if SSW hired Rock Island employees, SSW was still obligated to pay its furloughed employees unemployment benefits.

The agreement implementing the March 4 agreement and the arbitration decision arising out of acquisition of the Missouri Pacific trackage rights were reached without input from former Rock Island employees. The Rock Island employees viewed the agreement as giving SSW employees a disproportionate share of the jobs on the Tucumcari Line and Missouri Pacific track.

Jerry Volkman, one of the class representatives, filed an internal union appeal challenging the implementing agreement as unduly favorable to SSW employees. The UTU Board of Appeals decided in his favor on March 11, 1983, and ordered UTU to enter negotiations with SSW for a new implementing agreement. Negotiations reached an impasse and, on September 30, 1983, the union president informed Volkman that SSW would not accept the union proposals and that Volkman was free to take legal action. (The district court found UTU informed former Rock Island employees that negotiations were also intended to rectify the results of the arbitration arising out of the Missouri Pacific trackage rights transaction.) Volkman filed this case in December 1983.

The district court found the statute of limitations was tolled and the action was timely. The court also found that in negotiating the implementing agreement and in the arbitration, SSW and UTU excluded the representative of the Rock Island workers so that the union was represented by a negotiator whose constituents were SSW Corsicana Line workers. The court concluded UTU had breached its duty of fair representation and had negotiated agreements favoring SSW employees over former Rock Island employees, and that defendants had failed to comply with the March 4 labor protective agreement.

The court granted relief to some of the Rock Island Tucumcari Line employees, concluding that former Rock Island employees from lines other than the Tucumcari were not entitled to relief because they were not entitled to preferential hiring under the March 4 agreement. Appellants moved for reconsideration and requested that the record be reopened to permit them to present evidence in support of their claims. The court denied the motion.

*Appellants' contentions.*

■ Appellants contend that as Rock Island employees who worked on a line that shared a terminal with the Tucumcari Line, they were entitled to preference over SSW employees under the March 4, 1980, protective agreement. We conclude the language of the agreement gave all eligible Rock Island employees, whether on-line or off-line, preference in hiring for positions resulting from the Rock Island acquisition.

■ Although collective bargaining agreements are not ordinary contracts and are not governed by the same common law concepts that govern private contracts, *see Transportation–Communication Emp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 160–61, 87 S.Ct. 369, 371–72, 17 L.Ed.2d 264 (1966), *reh'g denied* 385 U.S. 1032, 87 S.Ct. 737, 17 L.Ed.2d 680 (1967), certain basic contract interpretation principles apply to construction of labor agreements. *See Mastro Plastics Corp. v. National Labor Rel. Bd.*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309, *reh'g denied* 351 U.S. 980, 76 S.Ct. 1043, 100 L.Ed. 1495 (1956). If the language of the agreement is unambiguous, it may be construed as a matter of law without resort to extrinsic evidence of intent. *See, e.g., Ill. Conference of Teamsters Wel. Fund v. Mrowicki*, 44 F.3d 451, 458 (7th Cir.1994).

■ Here, the district court held the agreement was ambiguous, looked to extrinsic evidence of intent, and concluded the eight appellants were not entitled to any relief. However, whether an agreement is ambiguous is a question of law subject to de novo review. *See Central States v. Independent Fruit & Produce Co.*, 919 F.2d 1343, 1350 (8th Cir.1990), *cert. denied* 502 U.S. 811,

112 S.Ct. 59, 116 L.Ed.2d 35 (1991). On the limited issue presented by the eight appellants, we conclude the agreement is unambiguous, and that the eight appellants are entitled to preferential hiring under the plain language of the agreement.

Article II of the March 4 agreement governed hiring and work rules. Section 1 provided: "All employees of the Rock Island ... who held seniority on the effective date of this agreement in a craft represented by one of the labor organizations signatory hereto shall be eligible for participation in the hiring procedures described in this Article." Because appellants all held seniority as brakemen or conductors with Rock Island on the effective date, they were eligible for participation in the hiring procedures.

Section 2 of Article II of the agreement provided that a purchasing carrier would determine its additional manpower requirements "by craft due to its taking over those Rock Island ... Lines," and that a purchasing carrier would not recall its own furloughed employees "as a result of the additional manpower requirements resulting from a transaction, until after bankrupt carrier employees on **appropriate seniority rosters** have exhausted their opportunity to be hired hereunder." (Emphasis added.)

Section 3 of Article II of the agreement provided:

> As a carrier determines its need for additional employees under this Article, it shall allow **eligible employees in seniority order on the Rock Island** or Milwaukee the first right of hire respectively, dependent on whose trackage is involved.... In carrying out the purposes of this section, the purchasing carriers shall **first utilize existing seniority rosters applicable to the appropriate craft and seniority district for the lines and territories involved** in fulfilling employment needs in connection therewith." (Emphasis added.)

The district court's findings of fact established that on the Rock Island, seniority of brakemen or conductors was not transferable from one district to another. A brakeman or conductor who left one district for another would be treated the same as a person walking in off the street; he would have no seniority outside his own district. Rock Island employees who worked on different lines therefore had no seniority in any district on the Tucumcari Line. However, the district court rejected the narrow construction urged by SSW, under which it would be obligated to exhaust only the Rock Island roster for the district where a vacancy existed before recalling its own furloughed employees. The court ruled that SSW was required to give out-of-district Rock Island Tucumcari Line brakemen priority over SSW brakemen, but that SSW was not required to give preference to off-line employees because they were not on any appropriate Rock Island seniority roster for the Tucumcari Line.

We disagree with the district court's interpretation as regards off-line employees. Read as a whole, section 3 of Article II requires SSW to give the first right of hire to **eligible Rock Island employees in seniority order,** by **first** using the existing seniority rosters for the appropriate craft and seniority districts for the lines and territories involved. The fact that SSW must **first** use existing appropriate craft and seniority rosters for the lines and territories involved contemplates that SSW would then use other rosters of eligible Rock Island employees.

Under section 1 of Article II, appellants are eligible Rock Island employees because they held seniority with Rock Island on the effective date. Although appellants held seniority in districts on other Rock Island lines, section 1 does not require that seniority be in a district on the acquired line. Under the plain language of section 3, whether or not appellants had seniority in a Tucumcari Line district, they had first right of hire over SSW employees because they were eligible Rock Island employees.

Section 3 is not inconsistent with section 2, which forbids SSW from recalling its own furloughed employees until after **appropriate** Rock Island seniority rosters are exhausted. Section 2 does not define the appropriate seniority rosters. Under section 3, the appropriate rosters are first the roster from the Rock Island Tucumcari Line seniority district or territory where another employee is needed, and then rosters from other Rock

Island seniority districts, including districts from other lines.

The narrower construction adopted by the district court requires reading implied language into section 1 of Article II, which defines eligible employees to include any Rock Island employee who held seniority in a craft on the effective date of the agreement. The express language is not limited to Rock Island employees who held seniority in a district on an acquired line. Again, section 1 defines eligible employees as "[a]ll employees of the Rock Island ... who held seniority on the effective date of this agreement in a craft represented by one of the labor organizations signatory." The narrow construction also requires construing the phrase "eligible employees in seniority order on the Rock Island" in section 3 to mean eligible employees in seniority order on the acquired lines of the Rock Island.

Although we base our construction on the unambiguous language of the agreement, we note that it is consistent with the court's findings of fact on the implementing agreements SSW entered into with other crafts. SSW agreed to hire Rock Island engineers and clerks first from the Tucumcari Line district where a new position was needed, then from other Tucumcari Line districts, and then from districts on other Rock Island lines. The court found these practices supported its construction of the March 4 agreement.

We conclude the language of the March 4 agreement unambiguously gave appellants, as off-line Rock Island employees, priority in hiring over furloughed SSW employees for any position that was the result of the acquisition of the Tucumcari Line. Because the district court ruled that appellants were not entitled to preferential hiring under the agreement, they had no opportunity to prove they were entitled to relief. On remand, appellants must be given that opportunity.

*Defendants' contentions.*

Defendants seek affirmance of the judgment, contending that for a variety of reasons, the district court erred in granting relief to any of the plaintiff class.

SSW first asserts the district court erred by ruling that the March 4 agreement "solely governed" all work assignments on the Tucumcari Line and the Missouri Pacific trackage resulting from the restructure of operations arising from the Missouri Pacific trackage rights. SSW contends that under the labor protective conditions imposed by the September 1982 ICC order regarding the Missouri Pacific trackage rights, the railroad was not required to hire any Rock Island employees to fill positions resulting from the trackage rights transaction before recalling its own furloughed employees.

Contrary to SSW's assertion, the district court did not rule that the March 4 agreement "solely governed" all work assignments resulting from the trackage rights transaction. The district court ruled that traffic on the Tucumcari Line and the Missouri Pacific track that was not diverted from the Corsicana Line was the result of the Tucumcari Line acquisition and was therefore governed by the agreement. However, the court ruled that traffic diverted from the Corsicana Line was not the result of the Tucumcari Line acquisition and was not governed by the March 4 agreement, and that SSW employees had priority to work that diverted traffic. The court found this was required by the ICC order.

SSW's real objection appears to be to the district court's conclusions on what traffic could be attributed to each transaction. SSW's argument seems to be based on the premise that the increase in traffic over the Tucumcari Line and the Missouri Pacific track after diverted traffic began running in January 1983 was the sole result of the trackage rights transaction and could not be the result of the Tucumcari Line acquisition. The district court clearly rejected that premise, concluding that

the additional manpower requirements of non-diverted traffic on the Kansas City to St. Louis segment were a result of the initial purchase of the Tucumcari line. Any increase in employment because of non-diverted traffic on the rest of the line was also attributable to the original purchase of the Tucumcari Line.

724 F.Supp. at 1326. The court based that conclusion on findings of fact that the two transactions were closely interrelated and were recognized as such by ICC. SSW has not shown that these findings of fact are clearly erroneous, nor has it made any argument that the conclusion drawn from them is incorrect. SSW has shown no reason why this court should disturb the district court's findings and conclusions on this issue. Accordingly, we reject the premise underlying SSW's argument.

We conclude the district court did not err in determining that SSW remained obligated to give Rock Island employees priority to work non-diverted traffic after January 1983. Appellants were entitled to priority in hiring to work non-diverted traffic.

Defendants contend the drafting history of the agreement shows that the district court erred in concluding the March 4 agreement required that all present and future vacancies be filled by Rock Island employees until the agreement expired. They point to deletion of the phrase "present and future" from a draft of the clause providing that a purchasing carrier shall determine its necessary additional manpower requirement due to its taking over the lines. We disagree.

We note that SSW again misstates the district court's ruling. The court did not rule the March 4 agreement required that all vacancies be filled by Rock Island employees until the agreement expired. The court ruled that the agreement required SSW to give preference to Rock Island employees for all jobs attributable to the Tucumcari Line during the four-year period.

We reject SSW's argument as contrary to the plain language of the agreement. Article II, section 5 of the agreement governs "Duration of Preferential Hiring." It provides that the procedures established in Article II "shall continue in full force and effect for not less than one year from the effective date from the commencement of operations or as otherwise provided for by law, but in no event beyond April 1, 1984." Deletion of the phrase "present and future" could not change this express provision. Moreover, the district court found that SSW consistently interpreted the agreement to extend until April 1984.

Defendants contend the district court's findings of fact on the proportion of Tucumcari Line traffic that was diverted from the Corsicana Line were clearly erroneous. We disagree.

First, the district court did not, as defendants assert, find that only 4% to 5% of Tucumcari Line traffic was diverted from the Corsicana Line. The court found the plaintiffs' study the most credible after-the-fact estimate of diversion, and that study estimated diverted traffic to be 10%. The 4% to 5% figure mentioned by the court was a reference to a position taken by SSW in arbitration over furloughing of Corsicana Line employees, not a finding on the percentage of traffic diverted. The court did not rely upon the diversion percentage estimate made by SSW in the arbitration, but on the railroad's estimate of the number of Corsicana Line employees affected by diversion. Any error in the court's reference to the figure was harmless because the court relied on other evidence to determine the amount of diverted traffic.

Moreover, it is not clear that the court misinterpreted the percentage estimate in the manner asserted by SSW. SSW's position in the arbitration was that 4% to 5% of Corsicana Line traffic was diverted to the Tucumcari Line. SSW asserts the district court misconstrued its position to be that 4% to 5% of Tucumcari Line traffic was diverted from the Corsicana Line. SSW's position as stated by the court was that "diversion to the Kansas City Division [Tucumcari Line] from the Corsicana Line was 5% in 1983 and 4% in 1984." 724 F.Supp. at 1315. The court's statement can be read to mean that 4% to 5% of Corsicana Line traffic was diverted to the Tucumcari Line just as easily as it can be read to mean that 4% to 5% of Tucumcari Line traffic was diverted from the Corsicana Line. We will not presume from this ambiguous language that the court erred in its interpretation of the evidence.

Defendants' argument that it was clearly erroneous for the court to rely on plaintiffs' study must fail for lack of a sufficient record. Defendants have failed to in-

clude the study itself in the record, and have provided only portions of Mark Hornung's testimony. *See* Fed.R.App.P. 10(b)(2); 10th Cir.R. 10.1. In the absence of a complete record, this court cannot review the issue. In any case, the court expressly found Hornung the most credible witness on diversion, and credibility findings are entitled to great deference on appellate review. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Defendants' argument that the district court erred in concluding that UTU breached its duty of fair representation is without merit. Their assertion that the court's ruling on breach of the duty of fair representation is based on hindsight interpretation of complex ICC orders is unfounded. The court made extensive and detailed findings on how SSW and the UTU negotiator representing the Corsicana Line employees misled the representatives of the Rock Island employees and excluded them from negotiations, and then negotiated agreements that favored Corsicana Line employees over the Rock Island employees. Nothing similar occurred in *Rucker v. St. Louis Southwestern Ry. Co.,* 917 F.2d 1233 (10th Cir.1990), on which defendants rely.

■ Defendants contend the judgment should be affirmed because the district court erred in refusing to invoke the primary jurisdiction doctrine and dismiss appellants' claims. However, application of the primary jurisdiction doctrine would not have required dismissal of appellants' claims and would not result in affirmance of the judgment against appellants. Under the primary jurisdiction doctrine, claims properly cognizable in court that contain some issue within the special competence of an administrative agency may be referred to the agency and judicial proceedings stayed pending the agency's decision. Referral to the agency does not deprive the court of jurisdiction. The court may either retain jurisdiction, or, if the parties would not be unfairly disadvantaged, dismiss the case without prejudice. *See Reiter v. Cooper,* 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).

If defendants are correct in arguing the court should have invoked the primary jurisdiction doctrine, the judgment against appellants would be vacated, the matter would be referred to the ICC, and after the ICC's decision, further proceedings in district court would be required. This is not an argument for affirmance, but for reversal, and because the cross-appeals have been settled and are no longer pending, we will not address the issue.

■ Defendants also contend plaintiffs' claims are barred by the statute of limitations. Plaintiffs' claim for breach of duty of fair representation and breach of contract is subject to a six-month statute of limitations. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). However, ordinarily, a plaintiff must exhaust internal union appeals before filing suit, and the statute of limitations is tolled during those appeals. *See Frandsen v. Broth. Ry., Airline & S.S. Clerks,* 782 F.2d 674, 681 (7th Cir.1986).

Here, the principal breaches of the March 4 agreement alleged by plaintiffs were the implementing agreement regarding SSW's acquisition of the Tucumcari Line, and the negotiations and the arbitration decision over labor protective conditions arising out of SSW's acquisition of the Missouri Pacific trackage rights. This action was not filed until December 1983, but the district court found that internal union appeals of the February 23, 1982, implementing agreement by the named plaintiff tolled the statute of limitations until September 1983.

After Volkman prevailed in his appeal on March 11, 1983, UTU attempted to negotiate a new implementing agreement that would also correct the effect of the arbitration over the labor protective conditions in the trackage rights transaction, but could not reach an agreement with SSW. On September 30, 1983, the union formally advised Volkman that SSW would not accept the union proposals and that he could take legal action.

In *Clayton v. UAW,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), the Court held that an employee was not required to exhaust futile internal union appeals before filing an action for breach of duty of fair

representation and breach of contract. Defendants now seek to use *Clayton* against employees, arguing that the internal union appeals in this case were futile, and that because an employee need not exhaust futile internal appeals, such appeals cannot toll the statute of limitations. We disagree.

In *Clayton*, the court held that an internal union appeal is futile if it cannot result in either complete relief to an aggrieved employee or reactivation of his grievance. 451 U.S. at 689, 101 S.Ct. at 2095. Defendants argue the internal appeal was futile because it could not provide plaintiffs with full relief, which depended on the concurrence of a third party, SSW. UTU's internal appeal process could result only in a UTU decision to seek a new implementing agreement with SSW. UTU could not grant a new agreement unilaterally.

■ Although it is settled law that an employee need not exhaust futile internal union appeals before filing suit, it is not settled that the statute of limitations runs while an employee pursues internal appeals that turn out to be futile. In *Frandsen*, 782 F.2d 674, the court held that pursuit of futile union grievance procedures tolled the statute of limitations. The court noted that *Clayton* created an exception to the exhaustion requirement to allow employees to bring claims against their unions and employers without unnecessary delay caused by futile internal appeals. The court concluded that *Clayton* should not be construed to require them to bypass internal appeals that prove to be futile.

The court in *Frandsen* noted that existence of futile appeals that need not be exhausted may present employees with a dilemma:

"If the employee does not exhaust internal union remedies, he can be certain that the defendant union will argue that this requires dismissal of the action. On the other hand, if the employee does pursue those remedies, he knows that the union will argue that exhaustion would have been futile, and therefore that the statute of limitations should not be tolled during the time it took the employee to exhaust. This is the "Catch 22" that Frandsen alleges he

is caught in. He argues that under the district court's holding, if *Clayton* doesn't get him, *DelCostello* will."

782 F.2d at 681. Whether exhaustion should be excused is discretionary with the district court; therefore, whether internal appeals are futile and need not be exhausted is not a clear cut issue, but instead must be determined on a case-by-case basis. The court concluded that employees should not be required to decide that issue and risk the running of the statute of limitations if they make the wrong choice. Consequently, the court held that pursuit of internal union remedies that ultimately prove to be futile tolls the statute.

See also *Lewis v. Intern. Broth. of Teamsters, Local 771*, 826 F.2d 1310, 1318 (3d Cir.1987) (statute does not begin to run until futility of appeal becomes apparent); *Galindo v. Stoody Co.*, 793 F.2d 1502, 1509–10 (9th Cir.1986); *Adkins v. Intern. Union of Elec., Radio & Mach.*, 769 F.2d 330, 336 (6th Cir. 1985) (good faith attempt to exhaust futile internal union remedies prevents accrual of claim); *Walker v. Teamsters Local 71*, 714 F.Supp. 178, 188 (W.D.N.C.1989), *aff'd in part and rev'd in part on other grounds* 930 F.2d 376 (4th Cir.), *cert. denied* 502 U.S. 1004, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991) (any reasonable effort by plaintiffs, however futile, tolls statute); *Balsavage v. Ryder Truck Rental*, 712 F.Supp. 461, 471 (D.N.J. 1989) (statute starts to run when employee receives clear written statement that further internal appeals are futile); *Leach v. Pan American World Airways*, 651 F.Supp. 713, 716 (S.D.Fla.1986), *rev'd on other grounds* 842 F.2d 285 (11th Cir.1988) (following *Frandsen*). Cf. *Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235 (6th Cir.), *cert. denied* —— U.S. ——, 114 S.Ct. 92, 126 L.Ed.2d 60 (1993) (completely futile appeals that can afford plaintiff no relief do not toll statute; however, tolling is left to court's discretion). *But see Acri v. International Ass'n of Machinists*, 781 F.2d 1393, 1396, n. 1 (9th Cir.), *cert. denied* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986) (duty of fair representation claims relating to negotiation of collective bargaining agreements or work rules are not subject to exhaustion requirement and

statute of limitations is not tolled by internal appeals).

The exhaustion requirement contained in the UTU constitution is significant. It provides that no member "shall resort to the civil courts to correct or redress any alleged grievance or wrong, or to secure any alleged rights" from the union until the member "shall have first exhausted all remedy by appeal provided in this Constitution for the settlement and disposition of any such rights, grievance, or wrongs." The union Board of Appeals certainly regarded Volkman's appeal as a matter subject to the union's appeal procedures. The UTU constitutional provision was broad enough to have required Volkman to exhaust the union appeal process before filing this action, whether or not the union could afford him complete relief. Here, the internal appeal was not optional.

Two of the cases cited by defendants are distinguishable on this ground. In *Chambers v. United Steelworkers*, 589 F.Supp. 39, 42–43 (N.D.Ohio 1984), and *Smith v. Expert Automation*, 726 F.Supp. 1080, 1082–83 (E.D.Mich.1988), the futile internal union remedies that could not afford plaintiffs complete relief were optional. Under the language of the UTU constitution, the remedies were not optional.

We conclude the statute of limitations was tolled by Volkman's internal union appeal.

The judgment against the eight appellants is REVERSED, and the case is REMANDED for further proceedings to determine what relief, if any, appellants should receive.